(No. 60705.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHNNIE LEE EVANS, Appellant.

*Opinion filed September 29, 1988.—Rehearing denied December 5, 1988.*

STAMOS, J., took no part.

James J. Doherty, Paul P. Biebel, Jr., and Randolph N. Stone, Public Defenders, of Chicago, and Kyle Wesen-

dorf and Richard E. Cunningham, Assistant Public Defenders, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert and Terence M. Madsen, Assistant Attorneys General, of Chicago, and Thomas V. Gainer, Jr., Kenneth T. McCurry, and Inge Fryklund, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE MORAN delivered the opinion of the court:

Defendant, Johnnie Lee Evans, was indicted in the circuit court of Cook County on three counts of murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)), one count of attempted rape (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4, 11—1), and two counts of armed violence (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2) against Adrian Allen in violation of the Criminal Code of 1961. The armed violence counts were subsequently nol-prossed by the State. Defendant was tried by a jury and found guilty on the remaining counts of murder and attempted rape. Defendant waived his right to a jury at the separate bifurcated death sentencing hearing. The trial court found that the necessary aggravating factors existed, and that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The court thereupon sentenced defendant to death on the murder charges and to a 30-year extended term of imprisonment on the attempted rape charge. Defendant's post-trial motion was denied, and he brings a direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

During the pendency of defendant's appeal, the United States Supreme Court issued its decision in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69,

106 S. Ct. 1712. *Batson* held that a prosecutor cannot exercise peremptory challenges to exclude veniremen solely on account of race and that a defendant may show such purposeful discrimination based solely on the facts in his own case. Subsequently, in *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708, the United States Supreme Court held that *Batson* is retroactively applicable to cases pending on direct appeal at the time *Batson* was decided.

In light of the *Batson* and *Griffith* decisions, we issued a supervisory order on May 1, 1987, wherein we retained jurisdiction of this cause and remanded the case to the trial court to "permit the defendant to present evidence to substantiate his claim of unconstitutional discrimination in the exercise of peremptory challenges," at a hearing to be conducted in accordance with *Batson.* If the trial court found a *prima facie* showing of discrimination, it was directed to determine whether there were race-neutral explanations for the challenges. The trial court conducted a *Batson* hearing on July 13, 1987, and found that defendant had failed to establish a *prima facie* case of purposeful discrimination by the State in the selection of the jury.

On return of the case to this court, defendant raises numerous issues, alleging evidentiary and constitutional errors at all stages of the proceedings. We shall address each in turn.

The evidence reveals that on January 22, 1983, the victim, a 16-year-old black woman, was stabbed to death in an elevator at 3547 South Federal, a building in a Chicago Housing Authority (CHA) complex. She had been stabbed 22 times and her body was found face down in a pool of blood with her coat opened, her shirt pulled up to her shoulders and her pants pulled down to her ankles. Further facts will be detailed as they become relevant to the issues addressed.

The first issue: Was the trial court's finding that defendant failed to establish a *prima facie* case of racial discrimination under *Batson* erroneous?

The evidence from the original transcript of *voir dire* indicates that the State peremptorily challenged 17 veniremen, 5 of whom were black. The State also peremptorily challenged two alternate jurors, one of whom defendant asserts was black. During the course of the *voir dire*, defendant moved to dismiss the venire on several occasions, claiming that the State was improperly excluding "black males" from the jury. Defendant did not allege as error the State's exercise of a peremptory challenge to remove a black female from the jury. The trial court found that there was no purposeful, systematic or improper exclusion of jurors.

The record further reveals that, on remand, defendant submitted a stipulation, entered into between defense counsel and the State, which pertained to the composition of the jury and the State's use of peremptory challenges. The stipulation indicated that two blacks served on defendant's jury, and that five blacks were peremptorily challenged by the prosecution. The defense put in no other evidence. At the conclusion of the *Batson* hearing, the trial court found, after considering all of the relevant circumstances, that defendant failed to establish a *prima facie* case of racial discrimination.

Initially, we note that defendant has waived any right to assert that the female black venireperson, Mary Patton, was improperly stricken from the jury by the prosecutor. *Batson* requires that the defendant make a timely objection to the prosecutor's peremptory challenge. (*Batson*, 476 U.S. at 99, 90 L. Ed. 2d at 89-90, 106 S. Ct. at 1724.) The peremptory challenge of Mary Patton was never objected to by the defense, either at trial or in post-trial motions. We do not believe that an objection occurring after the jury is sworn can be

deemed timely. Therefore, as the defense has objected to the challenge against Mary Patton for the first time on appeal, that particular objection has been waived. *People v. Stewart* (1984), 104 Ill. 2d 463, 488, *cert. denied* (1985), 471 U.S. 1120, 86 L. Ed. 2d 267, 105 S. Ct. 2368; see also *State v. Peck* (Tenn. Crim. App. 1986), 719 S.W.2d 553, 555 ("After a party has 'assured the court that the jury as empaneled is acceptable, the party will not be heard to complain of the makeup of the jury panel").

Similarly, defendant has waived the right to assert that Bobby Benford, the alternate juror, was improperly peremptorily challenged by the State. Although this juror was mentioned in the defendant's motion for a *prima facie* finding of discrimination submitted at the *Batson* hearing, his name was stricken from the roster of excluded blacks set forth in the evidentiary stipulation submitted to the court. There is no independent evidence whatever in the record to establish the race of this juror. Therefore, defendant's objection as to this challenge of Benford is also waived. (See *People v. Wheeler* (1978), 22 Cal. 3d 258, 280-81, 148 Cal. Rptr. 890, 905, 583 P.2d 748, 764.) Accordingly, when determining whether defendant has established a *prima facie* case of discrimination, we may consider only the remaining four black venirepersons who were excluded.

In *Batson* the Court reaffirmed the principle "that the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposely excluded." (*Batson*, 476 U.S. at 85, 90 L. Ed. 2d at 80, 106 S. Ct. at 1716.) In so holding, the Court rejected the evidentiary standard previously enunciated in *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, which required a defendant to show "the prosecutor's systematic use of peremptory challenges against

Negroes over a period of time" in order to establish an equal protection claim. (*Swain v. Alabama* (1965), 380 U.S. 202, 227, 13 L. Ed. 2d 759, 776, 85 S. Ct. 824, 839.) Under *Batson* a defendant may now rely solely on the evidence concerning the prosecutor's exercise of peremptory challenges at his own trial in order to establish a *prima facie* case of discrimination. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1722.

Establishing a *prima facie* case requires defendant to first show that he is a member of a cognizable racial group and that the State has exercised peremptory challenges to remove from the venire members of that racial group. Second, the defendant is entitled to rely on the fact that peremptory challenges constitute a jury-selection practice that permits those to discriminate who are of a mind to discriminate. Finally, defendant must show that these facts and "any other relevant circumstances" raise an inference that the prosecutor peremptorily challenged veniremen on account of their race. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723.

Defendant has met the first element of the *Batson* test for establishing a *prima facie* case of discrimination. Defendant is black and the prosecutor exercised peremptory challenges to remove from the venire members of defendant's race. Thus, the only question is whether, considering "all relevant circumstances," defendant has established a *prima facie* case of discrimination.

The relevant circumstances the trial court may consider when determining whether there was discrimination include: a "pattern" of strikes against black jurors; "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges" (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723); the disproportionate use of peremptory challenges against blacks (*State v. Gilmore* (1986), 103 N.J. 508, 535-36, 511 A.2d 1150, 1164; *People v. Wheeler*, 22 Cal.

3d at 274-75, 583 P.2d at 760, 148 Cal. Rptr. at 901-02); the level of black representation in the venire as compared to the jury (*Batson*, 476 U.S. at 93, 90 L. Ed. 2d at 85, 106 S. Ct. at 1721; *Aldridge v. State* (1988), 258 Ga. 75, 365 S.E.2d 111); whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic (*People v. Wheeler*, 22 Cal. 3d at 280, 583 P.2d at 764, 148 Cal. Rptr. at 905); the race of the defendant and victim (*Fields v. People* (Colo. 1987), 732 P.2d 1145, 1156; *Commonwealth v. McKendrick* (1986), 356 Pa. Super. 64, 77, 514 A.2d 144, 151, *appeal denied* (1987), 514 Pa. 629, 522 A.2d 558; *Commonwealth v. Soares* (1979), 377 Mass. 461, 490-91, 387 N.E.2d 499, 517, *cert. denied* (1979), 444 U.S. 881, 62 L. Ed. 2d 110, 100 S. Ct. 170); and the race of the witnesses (*United States v. Mathews* (7th Cir. 1986), 803 F.2d 325, 332, *rev'd on other grounds* (1988), 485 U.S. ___, 99 L. Ed. 2d 54, 108 S. Ct. 883). Simply because black veniremen are peremptorily challenged does not, without more, raise the specter or inference of discrimination. *Batson*, 476 U.S. at 101, 90 L. Ed. 2d at 91, 106 S. Ct. at 1725 (White, J., concurring) (it is not unconstitutional, without more, to strike one or more blacks from the jury); *People v. Hooper* (1987), 118 Ill. 2d 244, 247-49 (Ryan, J., specially concurring) (the court must avoid arbitrarily deciding this delicate question solely from the number of blacks peremptorily challenged); *Phillips v. State* (Ind. 1986), 496 N.E.2d 87, 89 (use of peremptory challenges against black jurors does not, by itself, raise an inference of racial discrimination).

Considering these circumstances in light of the actual facts of this case, we conclude that the trial court's finding that defendant failed to establish a *prima facie* case of discrimination was not against the manifest weight of the evidence. The trial court at the *Batson* hearing on remand found no pattern to the State's use of peremp-

tory challenges against black jurors which would show purposeful discrimination. Defendant has not presented any evidence to the contrary. The trial court, not the prosecutor, conducted the *voir dire*, and defendant does not contend on appeal, nor did he at trial, that the prosecutor's statements in exercising peremptory challenges indicated that the challenges were discriminatory.

Moreover, we cannot conclude that the State used a disproportionate number of peremptory challenges to exclude blacks from the jury. Even assuming that the prosecutor excused six blacks, including the two jurors as to whom defendant has waived his *Batson* challenge, the prosecutor excused twice as many nonblacks.

Furthermore, the level of black representation in the venire as compared to the jury does not indicate purposeful discrimination by the State. Two blacks served on the jury. Not including those veniremen excused for cause, the venire for jurors and alternates was composed of 55 individuals. The percentage of blacks in the venire (including, for the sake of argument, Patton and Benford) was 14.5%. The jury as empaneled was 16.66% black.

Defendant contends that the excluded black jurors were a heterogeneous group sharing race as their only common characteristic and thus he has established a *prima facie* case of discrimination. We disagree. The four excluded jurors as to whom defendant has not waived his claim of a *Batson* violation share two significant characteristics apart from their race. They are male and are engaged in nonprofessional occupations or are unemployed. (One was a bus driver, one was a student, one was a contract laborer, one was unemployed.) Consequently, it cannot be said that race is the only characteristic shared amongst the excluded black jurors.

Perhaps even more significantly, unlike *Batson* this is not a case involving an interracial crime in which specific

racial groups would be prone to take sides of prejudice. (See, *e.g., Commonwealth v. McKendrick* (1986), 356 Pa. Super. 64, 77, 514 A.2d 144, 151.) Here, the defendant is black, the victim was black, and the majority of witnesses are black. Any racial issue inherent in the selection of the jury is therefore minimal, if not nonexistent. Both pre-*Batson* and post-*Batson* cases recognize that the racial characteristics of a crime are important factors to be considered by the trial court in determining whether a *prima facie* case of discrimination has been established. (See, *e.g., State v. Butler* (Mo. App. 1987), 731 S.W.2d 265, 269 (the susceptibility of the particular case to racial discrimination should be evaluated), followed in *State v. Antwine* (Mo. 1987), 743 S.W.2d 51, 64, *cert. denied* (1988), 486 U.S. 1017, 100 L. Ed. 2d 217, 108 S. Ct. 1755; *Commonwealth v. McKendrick*, 356 Pa. Super. at 77, 514 A.2d at 151 (look to racial character of the crime); *Commonwealth v. Soares* (1979), 377 Mass. 461, 490-91, 387 N.E.2d 499, 517 (common group membership of the victim and majority of remaining jurors), *cert. denied* (1979), 444 U.S. 881, 62 L. Ed. 2d 110, 100 S. Ct. 170; *Wheeler*, 22 Cal. 3d at 281, 583 P.2d at 764, 148 Cal. Rptr. at 905 (common group membership of victim and majority of remaining jurors).) Indeed, as one court has found, there is no advantage to a prosecutor in excluding blacks from a jury where the State's primary witnesses are black. See *Matthews*, 803 F.2d at 332 (key witnesses for both sides were black, thus discounting any advantage that a discriminating prosecutor might perceive in striking blacks from the jury).

While reviewing the relevant circumstances of this case, we must keep in mind that the initial determination of whether a *prima facie* case has been established is left to the judgment of the trial judge, who is in a superior position to determine whether the prosecutor's exercise of peremptory challenges was motivated by group

bias. "We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a *prima facie* case of discrimination against black jurors." (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Trial judges are especially well suited to make this determination because they are familiar with local conditions and prosecutors, and can draw upon their power of observation and judicial experience as a guide in distinguishing a true case of discrimination from a false one. *Wheeler*, 22 Cal. 3d at 281, 583 P.2d at 764, 148 Cal. Rptr. at 905.

Here, the trial court found that all the relevant circumstances showed that the prosecutors were not excusing prospective jurors because of their race. Based upon our careful review of the record, we cannot say that the trial court's finding is against the manifest weight of the evidence. *People v. Conner* (1979), 78 Ill. 2d 525, 532.

Defendant responds, however, that the trial court, in making its finding, improperly relied on written observations it made during the course of the original *voir dire*. Defendant contends that the trial court's reliance on its notes was improper, and cites the cases of *Garner v. Louisiana* (1961), 368 U.S. 157, 7 L. Ed. 2d 207, 82 S. Ct. 248, *People v. Harris* (1974), 57 Ill. 2d 228, *People v. Wallenburg* (1962), 24 Ill. 2d 350, *People v. Rivers* (1951), 410 Ill. 410, *People v. Kent* (1982), 111 Ill. App. 3d 733, and *People v. Vine* (1972), 7 Ill. App. 3d 515, as support for his assertion. These cases are inapposite.

All of those cases involved situations wherein the trial court had relied upon factors or information or personal knowledge external to the proceedings before the court. For example, in *Garner*, the trial court, without apprising the defendant, took judicial notice of facts external to the proceedings. In *Harris*, the judge conducted a personal investigation by inquiring of the

defendant's attorney what the defendant had told another attorney who represented him in a previous, unrelated trial. In *Wallenburg*, the judge had personal knowledge of certain aspects of the case which was gained outside the trial and upon which he relied upon in making his rulings. In *Rivers*, the judge heard evidence and undertook private investigations outside open court. In *Kent*, the judge had personal knowledge about the defendant's expert witness gained from prior personal observations unrelated to trial. The judge also stated on the record that he had a low opinion of the expert's credibility based upon the judge's previously formed beliefs which were unrelated to the case pending before him. In *Vine*, the judge had obtained information relative to the defendant's case from having presided over a codefendant's trial. In this case, the notes taken by the judge related to his own observations of the occurrences at the *voir dire*, and the notes pertained only to the internal affairs transpiring before the court. The events recorded by the judge during *voir dire* were in open court in the presence of the parties and with their knowledge.

We can discern no basis for concluding that the trial court's reliance on its notes, taken contemporaneously with the events recorded, violated defendant's constitutional rights. This is so particularly where, as here, the defendant does not contest the accuracy of the notes and the observations in the notes are supported by the record.

Having determined that the trial court's finding was not against the manifest weight of the evidence, we need not address defendant's contention that the State should have been required to articulate a legitimate race-neutral basis for excluding black veniremen. *Batson* requires that a defendant establish a *prima facie* case of discrimination before the prosecutor is required to articulate his

explanation for challenging black jurors. *Batson,* 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

The next issue is whether defendant's inculpatory statements concerning the Allen murder and attempted rape should have been suppressed on the ground that they were the product of an illegal arrest.

At the pretrial suppression hearing, John Markham, a violent crimes detective with the Chicago police department, testified that on January 23, 1983, he and his partner were investigating the Allen homicide at the scene of the offense. At approximately 9 a.m. that day, Markham was contacted by his office regarding the armed robbery and assault of another female, Annie Webb.

Markham stated that he returned to the office and reviewed the police report concerning the Webb investigation. Later that morning, he had a telephone conversation with Webb in which she advised him that she had additional information concerning her assailant, and that he should talk with a woman named Diane Smith. She advised him that Smith resided at 3517 South Federal, a CHA high-rise building adjacent to the building where the victim was murdered.

Markham and his partner interviewed Smith in her apartment later that afternoon. Smith informed them that Johnnie Richardson, the brother of her former boyfriend, visited her on January 17, 1983. He demanded sexual relations. When she refused his advances, he threatened her with a knife and told her "he was going to cut her throat." Eventually, after retrieving her own knife from the kitchen she was able to "push him out the door."

Smith further advised Markham that she wanted to file a complaint and she gave Markham a description of her assailant as a five foot, four inch tall black male, 29 or 30 years old, 160 pounds, with a dark complexion,

who wore glasses and who had a "lazy eye." Smith also informed the detectives that her assailant lived in an apartment in her building.

Markham further testified that he and his partner proceeded to that apartment and knocked on the door. A woman answered the door, and the detectives identified themselves as police officers and said they were looking for Johnnie Richardson. The woman invited them in, commenting, "you mean, my son Johnnie Lee Evans."

While the officers were talking to Mrs. Evans in the kitchenette, the defendant walked into the room from the back bedroom. He matched the description given by Smith of her assailant.

The detectives identified themselves and told him of the accusations against him. The defendant responded that "it was all a mistake, a misunderstanding." The officers placed the defendant under arrest for the crimes perpetrated against Diane Smith and Annie Webb and brought him to the police station at approximately 12:50 p.m. on January 23, 1983.

Defendant claims his arrest for the Smith aggravated assault was a mere pretext or subterfuge to place him in custody for purposes of questioning him about the Allen murder. In support of this contention, defendant points to the following facts: the six-day lapse between the commission of the Smith offense and his arrest; a violent crimes detective arrested him for the aggravated assault, a misdemeanor; and he was questioned after the arrest about an unrelated felony offense, Allen's murder.

The State responds that defendant was initially arrested for two crimes, the aggravated assault against Smith, a misdemeanor, and the felony offense of robbery and attempted rape of Webb. The State further argues that the arresting officer was a violent crimes detective who would normally investigate these types of matters.

The State also contends that there was probable cause to arrest defendant for the Smith offense.

We agree with the State. The trial court found that there was probable cause to arrest defendant on the Smith offense, and that the defendant was not arrested at that time for the Allen murder. A trial court's determination as to whether probable cause to arrest exists will not be disturbed unless it is manifestly erroneous. (*People v. Foster* (1987), 119 Ill. 2d 69, 83, *cert. denied* (1988), ___ U.S. ___, 100 L. Ed. 2d 628, 108 S. Ct. 2044; *People v. Clay* (1973), 55 Ill. 2d 501, 505.) We are satisfied that the trial court's finding of probable cause to arrest for the misdemeanor is supported in the record. The officer, after talking to the victim, had her complaint fresh in hand, and he immediately proceeded to the place given by the victim where defendant could be found. The officer knocked and announced his office and purpose and a woman invited him into her home where the defendant was arrested.

Any "delay" between the commission of the offense and defendant's arrest is irrelevant. The six-day lapse from the time of the Smith offense and the issuance of her complaint does not make defendant's arrest illegal. The defendant was arrested immediately after Smith filed a complaint with Detective Markham. Consequently there was no "delay" between the time the officers obtained probable cause to arrest and defendant's arrest.

The mere fact that an aggravated assault arrest is made by a violent crimes detective does not transform an otherwise lawful arrest into a pretextual arrest. Indeed, defendant cites no authority for this proposition and we are aware of none.

Finally, even though defendant was briefly asked about four offenses upon his arrival at the police station, that does not make his arrest pretextual. During this approximately five-minute encounter, defendant was asked

only one question relating to the Allen murder—whether he knew about the girl found in the elevator. Merely because defendant was in custody for one charge does not preclude the police from investigating other unrelated charges concerning the defendant. *People v. Cocroft* (1967), 37 Ill. 2d 19.

There is nothing in the record to suggest that the arrest of defendant was made other than in the ordinary course of investigation and for anything other than a proper purpose. We conclude that the trial court's finding that defendant's arrest was legal rather than pretextual was not error.

The next issue is whether defendant's written statement concerning the Allen murder was obtained in violation of his fifth amendment right to counsel.

Upon arriving at the police station, defendant was placed in an interview room while Markham reviewed various classification files to ascertain if there had been similar crimes in the housing development at South Federal. He learned of another rape which occurred on January 18, 1983. The victim was Maeline Mitchell.

Markham returned to the interview room around 1 p.m. and questioned defendant about the Webb, Smith and Mitchell crimes. He also asked one question about the Allen homicide. Defendant denied any involvement in those crimes. Markham also asked defendant for his clothes because they appeared to be blood-stained.

At approximately 8:30 p.m., defendant was placed in a lineup and Webb, Smith and Mitchell identified defendant as their assailant. Defendant was subsequently placed in an interview room where he was questioned about the Smith, Webb and Mitchell crimes, and the Allen murder, from 11 o'clock that evening until 3 o'clock the next morning. At approximately 1 a.m. on January 24, 1983, defendant made his first inculpatory statement concerning the Allen homicide.

At approximately 4 p.m. on January 24, 1983, Markham had a further conversation with defendant in which he again made an inculpatory statement concerning the Allen homicide. Markham then summoned an assistant State's Attorney.

Following a conversation with Assistant State's Attorney William Merritt, during which defendant made incriminating statements regarding the Allen homicide, he was asked to make a formal written statement concerning that offense. Defendant agreed to do so, and with Detective Markham and a court reporter present, Merritt again apprised defendant of his *Miranda* rights. At that time, the following colloquy took place:

"MR. MERRITT [Assistant State's Attorney]: I'm going to read you your rights, again, from this form entitled, waiver of Constitutional rights. Do you understand that you have a right to remain silent?

DEFENDANT: Yes.

MR. MERRITT: Do you understand that anything you say can and will be used against you in a court of law?

DEFENDANT: Yes.

MR. MERRITT: Do you understand that you have the right to talk to a lawyer and have him present with you while you are being questioned?

DEFENDANT: Yes.

MR. MERRITT: Do you understand if you cannot afford to hire a lawyer, one will be appointed by the court to represent you before any questioning, if you wish one?

DEFENDANT: You mean, I can have a PD [Public Defender] in here, or do you mean I have to wait?

MR. MERRITT: You can have a lawyer if you want one when we talk. Do you understand that?

DEFENDANT: Yes.

MR. MERRITT: Do you understand each of these rights I have explained to you?

DEFENDANT: Yes.

MR. MERRITT: Understanding these rights, do you wish to talk to us now?

DEFENDANT: We can take time for you to get a PD, right?

MR. MERRITT: It will take a little while. I'll stop the questioning, and we will call for a public defender.

DEFENDANT: No, go ahead.

MR. MERRITT: Go ahead with this interview?

DEFENDANT: Yes."

Following this exchange, defendant gave a signed written statement confessing his complicity in the Allen homicide.

Defendant claims that his questions regarding the availability of a public defender, quoted above, constituted an invocation of his right to counsel, and mandated that all further interrogation cease. The State responds that the defendant did not invoke the right to counsel, but rather he unambiguously requested that the interview proceed.

There is no question that when a defendant invokes his right to counsel all further interrogation must cease. (*Miranda v. Arizona* (1966), 384 U.S. 436, 474, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1628.) The right to counsel may, however, be waived, provided that the waiver is voluntary, knowing and intelligent. *Edwards v. Arizona* (1981), 451 U.S. 477, 482, 68 L. Ed. 2d 373, 385, 101 S. Ct. 1880, 1883.

In *Smith v. Illinois* (1984), 469 U.S. 91, 95, 83 L. Ed. 2d 488, 493-94, 105 S. Ct. 490, 492, the United States Supreme Court set forth a two-part test to determine whether statements obtained during a custodial interrogation may be used against the accused. The first prong of this test requires a determination as to whether the accused actually invoked his right to counsel. The Court recognized that an invocation may be either express, ambiguous or equivocal. Once it has been determined that

the accused initially invoked his right to counsel, the question becomes whether he then initiated further conversation with the police so as to knowingly and intelligently waive his previously asserted right.

Our review of the record indicates that defendant never invoked his right to counsel—equivocally, ambiguously or otherwise. He merely inquired as to the availability of a public defender. When the State responded that it would cease questioning and obtain a lawyer for defendant if he so wanted, he promptly rejected the right to counsel by requesting that the interview continue.

Defendant draws our attention to several cases wherein purportedly ambiguous or equivocal requests for counsel were deemed sufficient to require that further interrogation cease. (*E.g., People v. Superior Court* (1975), 15 Cal. 3d 729, 732, 125 Cal. Rptr. 798, 800, 542 P.2d 1390, 1392 ("I guess we need a lawyer"), *cert. denied* (1976), 429 U.S. 816, 50 L. Ed. 2d 76, 97 S. Ct. 58; *State v. Ayers* (1974), 16 Or. App. 300, 303, 518 P.2d 190, 192 ("Maybe I should see an attorney," and "I should talk to an attorney"), *cert. denied* (1974), 419 U.S. 1093, 42 L. Ed. 2d 686, 95 S. Ct. 687; *Ochoa v. State* (Tex. Crim. App. 1978), 573 S.W.2d 796, 799 ("[Defendant] said that he probably ought to talk to a lawyer"); *State v. Nash* (1979), 119 N.H. 728, 730-31, 407 A.2d 365, 366 ("[Defendant] thought he had better talk to an attorney"); *People v. MacNab* (1987), 163 Ill. App. 3d 153, 159 ("When can I speak to a lawyer" and "Can I speak to a lawyer"), *appeal denied* (1988), 118 Ill. 2d 548.) While we do not agree with defendant that these cases reflect an attempt to invoke the right to counsel, we note that even if they did under the circumstances of this case, no such invocation was made. Here, defendant merely made an inquiry which referred to an attorney, and not "every reference to an attorney, no

matter how vague, indecisive or ambiguous, should constitute an invocation of the right to counsel." *People v. Krueger* (1980), 82 Ill. 2d 305, 311, *cert. denied* (1981), 451 U.S. 1019, 69 L. Ed. 2d 390, 101 S. Ct. 3009.

We note parenthetically that, even if we were to find that defendant's inquiry concerning the availability of a public defender was an ambiguous or equivocal request for counsel, our holding would be the same. This is not the situation condemned in *Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490, "wherein the State improperly used defendant's statements to cast retrospective doubt on the clarity of the initial request." On the first occasion when defendant referred to a public defender, the State merely responded by advising defendant that he was entitled to have a lawyer present "when we talk." When defendant subsequently asked whether "we can take time for you to get a [public defender]," the prosecutor advised him that "it will take a little while," but he would stop the questioning and call for a public defender. In no sense can these remarks by the State be viewed as a surreptitious effort to induce defendant to say something which would cast doubt on an earlier request for counsel. The remarks do not constitute further interrogation but were simply responses to defendant's inquiries. See, *e.g.*, *United States v. Gotay* (2d Cir. 1988), 844 F.2d 971, 974-75 (reviewing Federal case law regarding ambiguous requests for counsel and clarifying inquiries by the State).

In a related contention defendant argues that his confession was coerced and that he succumbed to the implication that he would be considered uncooperative if he invoked his right to counsel.

The trial court found that the written statement was voluntarily made, and that defendant knowingly and intelligently waived his rights. Whether a statement is voluntary depends upon the totality of circumstances, and a

trial court's finding that a statement was voluntary will not be disturbed unless it is against the manifest weight of the evidence. (*People v. Clark* (1986), 114 Ill. 2d 450, 457.) The record discloses no evidence that defendant's waiver of counsel was somehow coerced, or that he was badgered into confessing after purportedly invoking the right to counsel. Indeed, defendant expressly stated that he was well treated by the police officers and that he gave the statement of his own free will. The finding of the trial court that defendant's statements were voluntarily made is not against the manifest weight of the evidence.

The case relied on by defendant, *People v. Medina* (1978), 71 Ill. 2d 254, as support for this contention is inapposite. In *Medina*, the defendant, a 17 year old, had been awakened by police at his home between 2:15 a.m. and 3:15 a.m., arrested, and taken to the police station for questioning about a shooting. Defendant had no prior arrests or previous experience with the criminal justice system. The questioning officer told the defendant that several witnesses, who accused him of the shooting, were coming to view him in a lineup. The officer also told defendant that his silence, in the face of such accusation, was an admission. In holding that he did not knowingly and intelligently waive his right to counsel, this court noted that "[i]n the intimidating atmosphere of an interrogation room, many otherwise hardy individuals, *except* those with exposure to and experience with the procedure, may succumb, even after assertions of their right[s] ***, to the implication that 'silence in the face of accusation is itself damning.' " (Emphasis added.) *Medina*, 71 Ill. 2d at 260.

In contrast, the defendant in this case was a 33-year-old man who had extensive prior experience with the criminal justice system, including several arrests and prison terms. In addition, the officers in this case never

suggested that defendant's silence would constitute an admission. Consequently, we hold that the statement was properly admitted into evidence.

The next issue is whether defendant's statements should have been suppressed on the ground that he was allegedly denied his sixth amendment right to counsel following his arrest.

Defendant claims that at the time the police began their interrogation of him, his sixth amendment right to counsel had attached, that simply because he eventually responded to the interrogation he did not waive his right to counsel, and since he did not initiate the subsequent questioning his oral statements should have been suppressed. The State responds that until charges were approved there was no decision to prosecute; hence, no adversarial judicial proceedings had been initiated and, therefore, there is no sixth amendment basis for suppressing the statements.

The trial court denied defendant's motion to suppress the statements, and that ruling will not be disturbed unless it is manifestly erroneous. (*People v. Gacho* (1988), 122 Ill. 2d 221, 237; *People v. Clark* (1986), 114 Ill. 2d 450, 457; *People v. Garcia* (1983), 97 Ill. 2d 58, 74, *cert. denied* (1984), 467 U.S. 1260, 82 L. Ed. 2d 856, 104 S. Ct. 3555.) The trial court heard the testimony and found that defendant had been given and had understood the *Miranda* warnings. Based upon review of the record, we cannot say that the trial court erred in making this ruling.

Moreover, the sixth amendment right to counsel does not attach until the commencement of adversarial judicial criminal proceedings (*Moore v. Illinois* (1977), 434 U.S. 220, 227, 54 L. Ed. 2d 424, 432-33, 98 S. Ct. 458, 464), even where "an individual's right to counsel has attached to an unrelated charge" (*People v. Martin* (1984), 102 Ill. 2d 412, 422, *cert. denied* (1984), 469 U.S. 935, 83

L. Ed. 2d 270, 105 S. Ct. 334). Because the mere interrogation of a defendant does not constitute "adversary judicial proceedings" (*Moran v. Burbine* (1986), 475 U.S. 412, 428-30, 89 L. Ed. 2d 410, 425-27, 106 S. Ct. 1135, 1145-46; *People v. Thompkins* (1988), 121 Ill. 2d 401, 432-33), and as defendant was afforded an opportunity to obtain counsel when such proceedings commenced, we hold that defendant's statements were not obtained in violation of his sixth amendment right to counsel.

Defendant next contends that he was denied a fair hearing on his motions to quash his arrest and suppress evidence because the judge presiding at that hearing was allegedly prejudiced against him. This argument is based upon the *sua sponte* recusal of the trial judge following his rulings on defendant's suppression motion and his motion to quash his arrest.

In recusing himself from presiding over defendant's trial, the judge made the following statement:

"I have had some matters that have in the past been against counsel for the defendant: namely citations for contempt which were later vacated.

I thought this matter over seriously and I do not believe I can give the defendant a fair trial under the circumstances. And one additional fact that my—I don't believe that I possess at this time the competence by reason of everything that has happened that I can give everyone a fair trial."

These statements were made after the judge had ruled on defendant's motions to suppress. Defendant claims that the above-quoted statements manifest the court's prejudice against defendant and precluded it from ruling fairly on his pretrial motions. Thus, defendant claims he is entitled to a new suppression hearing.

We note initially that the court's alleged "prejudice" was directed toward defendant's counsel, not the defendant. Significantly, the court in no way indicated that its

feelings interfered with its rulings on the motions at issue, only that they might impede its ability to give defendant a fair trial. The trial court is in the best position to determine whether it is prejudiced against a defendant (*People v. Hall* (1986), 114 Ill. 2d 376, 406, *cert. denied* (1987), 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618), and we are confident that the trial judge would have recused himself from hearing and ruling on those motions to suppress if he felt that he could not render a fair ruling.

Moreover, Judge Urso, to whom the case was transferred subsequent to the recusal, reviewed the entire transcripts from the suppression hearing and determined that "Judge Palmer's rulings on the motions were based on the evidence only, and I do not see how they relate to any feelings that he may have had to either Defense Attorney." He further stated that he "would not hesitate to review the findings made by a judge if [he] felt those findings were in error or prejudiced the defendant in any way."

Our independent review of the record supports Judge Urso's determination. We note in this connection that there is no evidence that Judge Palmer's rulings on the defendant's motions were motivated by "unconscious taint," bias or prejudice, nor does defendant direct our attention to any. Rather, they were objective rulings based on the evidence before him and were fully supported by that evidence. Accordingly, we decline to grant defendant a new hearing on his motion to suppress.

Defendant's next allegation of error concerns the admission of "other-crimes" evidence at his trial to show his intent to commit murder and rape. Defendant claims that the evidence was irrelevant because the other crimes were not substantially similar to the offense charged and, in any event, the prejudicial effect of the evidence outweighed its probative value.

The other crimes as to which evidence was introduced at trial were the armed robbery and aggravated battery of Annie Webb and the rape of Maeline Mitchell. Both Webb and Mitchell testified at trial.

Webb testified that the perpetrator of the armed robbery, the first offense, entered the elevator behind her and her two young children. She pressed her floor, then the man pressed a floor. The elevator started to rise when the man "mashed" the button, causing the elevator to stop. He pulled down a ski mask, told her to open her coat and loosen her clothing. She further testified that she opened her coat and loosened some of her clothing, and that the man started to fondle her and told her to remove her clothes and lie down, to cooperate and everything would be all right. She refused to lie down, and the man beat her about the head. One of the victim's children screamed, and the man commenced hitting the child in the head with karate sticks joined together by a chain. The child's head was broken open and she was bleeding. Webb also testified that people outside started hollering for the elevator. The man restarted the elevator and before departing he took the woman's purse, in which she carried a white-handled knife with a lion depicted on it.

Mitchell testified that a white-handled knife with a lion depicted on it was used by her attacker when she was raped. Mitchell further testified that the man got on the elevator after her by pushing open the closing elevator doors. The man pressed a floor and when the elevator started its ascent the man stopped the elevator, pulled down a ski mask and opened a white-handled knife with a lion depicted on it. Mitchell also testified that she offered the man what little money she had but he said he did not want money. The man started to fondle her and performed oral sex on her. He then asked her to kiss him and squeeze him tight. The man then

took off his coat and put it in the middle of the elevator floor and pointing to the coat with the knife, told her to lie down and said, "Lady, don't make me cut you up and leave you on this elevator," and "Don't make me kill you." He then had sexual intercourse with her.

Both crimes occurred in a CHA elevator in the same CHA complex at 35th and Federal, both crimes were committed by a man wearing a ski mask and in each instance the offense occurred after the man jammed a button on the elevator, causing it to stop between floors. Webb and Mitchell both testified that the perpetrator had a "lazy, wavy" eye, and both identified defendant as their assailant in individual lineups on January 23, 1983, within a week of the offenses, as well as at trial.

It is well established that evidence of other crimes is admissible to establish *modus operandi*, intent, identity, motive or absence of mistake. (*People v. McKibbons* (1983), 96 Ill. 2d 176, 182 (*cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145), citing *People v. Baptist* (1979), 76 Ill. 2d 19; see also *People v. Stewart* (1984), 105 Ill. 2d 22, 61-62, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666.) Indeed, "this court has held that evidence of other offenses is admissible if it is relevant for any purpose other than to show the propensity to commit crime" (*People v. McKibbons* (1983), 96 Ill. 2d 176, 182), as long as there is a similarity between the other crimes and the offense for which defendant is charged (*People v. Taylor* (1984), 101 Ill. 2d 508, 520-21, *cert. denied* (1984), 469 U.S. 866, 83 L. Ed. 2d 140, 105 S. Ct. 209).

The crimes in the instant case were murder and attempted rape. The murder scene was a CHA elevator stopped between floors in the same apartment complex where the other two offenses occurred. The victim was found with her shirt and sweater pulled up, and her pants and undergarments pulled down to her ankles. She

had been stabbed 22 times with a cutting instrument such as a knife.

The above-related facts manifest that the Webb and Mitchell crimes were substantially similar to the offense with which defendant is charged, even though neither of those victims was murdered. Indeed, the character of the attacks and *modus operandi* were virtually identical. Based on the similarity of the scheme and design of the crimes, the evidence was relevant to the identification of the perpetrator of the murder and attempted rape of Allen. Moreover, the evidence of defendant's involvement in these other crimes is also relevant as to whether defendant possessed the necessary criminal intent. *People v. McKibbons* (1983), 96 Ill. 2d 176, 185-86.

Nor do we agree with defendant's conclusory assertion that the prejudicial effect of the evidence outweighed its probative value. As stated, we find the evidence highly probative of defendant's intent, particularly with respect to the attempted rape charge. Any prejudicial effect was limited when the jury was specifically instructed that the other-crimes evidence was received solely for the limited purpose "of the defendant's identification, intent and design" and was to be considered only for those purposes.

Accordingly, we hold that the other-crimes evidence was properly admitted. It is thus unnecessary to reach defendant's further claim that any alleged error in admission of the evidence was not harmless beyond a reasonable doubt.

Having determined that no reversible error occurred during the guilt phase of defendant's trial, we next consider allegations of error at the sentencing proceeding.

At the eligibility phase of the death sentence hearing, the defendant was found to have been over the age of 18 at the time he committed the murder. The trial court also found that the murder was committed during the

course of another felony—the attempted rape of the victim (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)). It was further found that defendant performed the acts which caused the victim's death with the intent to kill her. It was also found that the defendant acted with the knowledge that his acts were likely to cause death or great bodily harm to Allen. Defendant raises no contention nor alleges any error relative to these findings.

At the second stage of the sentencing hearing, the State introduced testimony by three of defendant's prior rape victims, including Tina Yancy. The court allowed in the testimony of Yancy over the defendant's objection that the Yancy case against the defendant was stricken on leave of the prosecutor nearly 10 years before this hearing. There was additional testimony supplied by the medical examiner relative to his internal examination of the victim, which included the fact that the victim was five months pregnant at the time of the murder. Department of Corrections personnel testified as to defendant's conduct while imprisoned at Menard penitentiary. The witnesses stated that defendant had been charged with five major infractions of the institution's disciplinary rules. Defendant's parole officer also testified to his belief that defendant was in need of mental health treatment. Additionally, the State introduced the testimony of a girl who, when 16 years old, allegedly received letters from the defendant while he was incarcerated at Menard penitentiary with her brother. In these letters, defendant asked her to become his girlfriend and if she were uncooperative, he asserted that, having already killed nine people and now knowing how to do it even better, "it would not be hard to put her ass away." In addition, pursuant to the State's motion, all the evidence admitted during the guilt phase of the trial was also admitted into evidence during this phase.

The defendant took the stand and testified to his unhappy and nomadic childhood. In sum, he stated that he lived with relatives and never knew his father; that he did not meet his mother until he was 14 years old and felt abandoned and unloved by her; that he was hospitalized for a cataract and that his left eye was subsequently removed when he was seven years old after a school girl knocked his eye out; that he had been sexually victimized in homosexual encounters, including one incident where he was threatened with a knife if he cried. Defendant further testified about his failed marriage and his two children from that marriage; that while he was awaiting trial on another rape offense, his three-year-old son was pushed down a flight of stairs and went into a coma and that the only person the son asked for was defendant. Defendant testified that when he was released his family was gone—his children had been taken away from him, and his wife had disappeared; that he he loved his children and that he wanted to be a father to them because he never had one. Defendant further testified that he raped women to get affection, to have somebody to love, to prove he was a man, and to get back at the State for taking away his children. He also stated that he could not get his children back because the State required too much—a place to stay and a certain amount of income. According to defendant, because he had just been released from jail, he had to start all over again and he was unable to earn enough money to get his children back. Defendant also testified that his mother knew he was on trial but she refused to come to court to testify for the defendant because she feared she would be evicted from her apartment by the CHA.

On cross-examination, defendant testified that he made up the story confessing to the Allen homicide at the insistence of Detective Markham, who told him what to say, because he wanted to protect his family from re-

taliation by the victim's family and to prevent his being tortured by police; that the police told him that if he confessed, the charge would be involuntary manslaughter because the victim was taller than he; that he wrote a letter to one of his prior rape victims but denied writing to the 16-year-old sister of a fellow inmate. He admitted, however, that the Islamic name and prison number on both envelopes were his; defendant stated that he had raped other women in elevators in the same CHA complex, but professed his innocence in the Allen murder. Defendant also stated that he would lie to save his life.

Defendant initially contends that the trial court improperly rejected his evidence of extreme mental or emotional disturbance as a mitigating factor precluding imposition of the death penalty. He relies for this claim primarily on the testimony of his expert witness, Dr. Alan Rosenwald, a clinical psychologist.

Dr. Rosenwald testified, among other things, that defendant suffered from a "psychopathology in the sexual area." When asked whether defendant suffered from extreme mental or emotional disturbance at the time of the offense, the witness responded: "Well, if extreme means chronic, I have trouble with the term extreme. I think this is a long-standing mental disturbance, and that consequently there would be periods of time where he would be acting under extreme duress. That he has been chronically ill for many years." The doctor also stated that he had spent only three hours examining the defendant, including administering three psychological tests, and another six to eight hours interpreting the data.

On cross-examination Dr. Rosenwald stated that he did not talk to any other person for corroboration or contradiction of defendant's statements, nor did he refer to any other prior psychological study or test concerning the defendant in forming his opinion. On further cross-

examination, Dr. Rosenwald testified that the defendant possessed average intelligence and could understand the nature of his actions when he committed the offense, and that the defendant did not suffer from psychosis. He further testified that his psychological report was not based on the history but rested on the test data obtained from defendant, and he felt that defendant had not lied to him. He stated that defendant told him about two homosexual rapes he allegedly experienced in his youth of which he recalled no mention being made in any other psychological report dating back to 1969. Dr. Rosenwald further stated that defendant was hostile towards women and felt rejected by them, and that defendant showed no remorse or sorrow for the rapes he committed. He also testified that he felt that defendant was a victim of society, and that his opinion would not be different if he knew that defendant had told any other psychologist or psychiatrist about the murder. He then opined that "it was highly probable that defendant was under emotional factors which could contribute to the crimes he committed."

Significantly, nowhere in his testimony does Dr. Rosenwald specifically state that defendant operated under extreme mental or emotional disturbance at the time he committed the offense. At most, he testified that defendant "was under emotional factors which *could* contribute to the crimes." (Emphasis added.)

Similarly, defendant's parole officer, Royal Fulton, upon whose testimony defendant also relies, suggested only that he believed defendant was in need of mental health treatment because of "psychosexual" problems. While he initially suggested that defendant acted under extreme mental or emotional disturbance, he subsequently testified that "[he] had not made that determination and that [his] thrust was that [defendant] was in need of mental health treatment."

We recognize that, as defendant contends, all relevant mitigating factors must be considered in determining whether imposition of the death penalty is appropriate. (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869; *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2594; see also Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d).) Here, the trial court did consider defendant's alleged mitigating evidence, but specifically found that the murder of Adrian Allen was not committed while defendant was acting under extreme or emotional disturbance, and that there were no mitigating circumstances or factors sufficient to preclude the imposition of the death sentence. The rule that this court will not lightly overturn the findings of the trial court, particularly when they are amply supported by the record, applies to findings made during the aggravation and mitigation phase of the death penalty hearing. (*People v. Christiansen* (1987), 116 Ill. 2d 96, 122-23, *cert. denied* (1987), 484 U.S. 873, 98 L. Ed. 2d 160, 108 S. Ct. 208.) There is ample support in the record for the trial court's finding and, accordingly, we decline to disturb it.

Defendant further draws our attention to several cases in which it was purportedly deemed error for the trier of fact to reject credible, uncontradicted evidence regarding defendant's mental incapacity, disturbance or defect. (*People v. Carlson* (1980), 79 Ill. 2d 564; *People v. Williams* (1980), 87 Ill. App. 3d 860; *Mines v. State* (Fla. 1980), 390 So. 2d 332, 337, *cert. denied* (1981), 451 U.S. 916, 68 L. Ed. 2d 308, 101 S. Ct. 1994; *Giles v. State* (1977), 261 Ark. 413, 549 S.W.2d 479, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 180, 98 S. Ct. 272. *Cf. People v. Jordan* (1954), 4 Ill. 2d 155 (the trier of fact is not free to reject defendant's uncontradicted and reasonable version of the circumstances surrounding his offense).) We find these cases distinguishable.

Unlike the instant case, the triers of fact in defendant's cited cases failed to consider uncontradicted evidence pertinent to a mitigating circumstance. Here, however, defendant simply failed to establish the *existence* of the mitigating factor by *any* evidence—uncontradicted or otherwise. He presented no testimony whatever that he operated under an *extreme* mental or emotional disturbance *at the time of the offense*, as required by the statute. Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)(2).

Defendant next claims that imposition of the death penalty is inappropriate and excessive because he suffers from "a longstanding emotional and psychological illness," because he is "remorseful," and because he purportedly has the potential to respond to treatment for his "illness." We disagree.

Defendant cites no authority for the proposition that these alleged factors render the death penalty inappropriate. Furthermore, defendant's own expert testified that defendant showed no remorse for his prior rapes. Based on the evidence before the trial court and after considering all aggravating and mitigating circumstances, the court determined that the death penalty was appropriate. Based on our review of the record, we cannot say that the court abused its discretion in sentencing the defendant to death. *People v. King* (1986), 109 Ill. 2d 514, 546, *cert. denied* (1986), 479 U.S. 872, 93 L. Ed. 2d 173, 107 S. Ct. 249.

Defendant further asserts that the trial court erred in accepting his waiver of the sentencing jury because the court did not inform him that imposition of the death penalty requires that the jury be unanimous in all of its findings.

This court has repeatedly held that waiver of the sentencing jury is valid if made knowingly and voluntarily, even where the trial court does not explain the unanimity requirement to the defendant before accepting the

waiver. (*People v. Guest* (1986), 115 Ill. 2d 72, 107, *cert. denied* (1987), 483 U.S. 1010, 97 L. Ed. 2d 746, 107 S. Ct. 3241; *People v. King* (1986), 109 Ill. 2d 514, 546; *People v. Madej* (1985), 106 Ill. 2d 201, 220-21, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 268; *People v. Ashford* (1988), 121 Ill. 2d 55, 81-82.) Here, the record supports the conclusion that defendant gave a knowing, intelligent and voluntary waiver of his right to a jury during the sentencing proceedings. The defendant signed a jury-waiver form after consulting with defense counsel, and the trial court extensively queried and admonished the defendant concerning the waiver. We conclude that defendant made a voluntary and intelligent waiver of the sentencing jury, and the court did not err in accepting it.

The next issue is whether it was reversible error to admit the testimony of Tina Yancy, one of defendant's alleged prior rape victims, into evidence at the second phase of the sentencing hearing. Yancy testified that she was raped in 1974, and identified defendant as her assailant. Her testimony was admitted into evidence over defendant's objection. On cross-examination, the defense brought out the fact that Yancy's identification of the defendant as her assailant had been tainted by the intercession of Janet Flowers, a friend of Yancy, who knew the defendant and was instrumental in securing defendant's arrest for the alleged rape.

Defendant claims that Yancy's testimony was inadmissible because, during his trial for that offense in 1974, defendant's motion to suppress her identification was granted. That case was then stricken pursuant to the prosecutor's motion, and defendant was never tried for the offense. Defendant thus asserts that admission of her testimony violated his right to due process, the doctrine of collateral estoppel, and the prior suppression order.

The State responds that the trial court was correct in allowing the introduction of the testimony while permitting the defense adequate cross-examination. The State suggests that the only question is whether the fact that the case was stricken on leave *ipso facto* operates to insulate the events of 1974 from all further consideration. The State contends that it should not, as to do so would place defendant in a better position because of the disposition of that case than if Yancy had never gone to the police.

At the sentencing phase, the only standards governing the admissibility of evidence are relevance and reliability. (*People v. Owens* (1984), 102 Ill. 2d 88, 110-11, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 361.) Defendant does not dispute the relevance of the evidence; rather, he claims it was unreliable as manifested by the prior trial court's order suppressing the identification. However, we note that, at the time the judge ruled on the admissibility of Yancy's testimony, he knew only that on the prosecutor's own motion the 1974 case against defendant was dismissed. The judge was not aware at that time that the case was stricken because Yancy's identification had been suppressed. The record of that 1974 proceeding was not before the court and defendant introduced no evidence indicating the reasons for the dismissal. Thus, defendant failed to present to the judge the full grounds for excluding Yancy's testimony at his sentencing hearing.

It may be assumed that in a bench sentencing hearing the trial judge bases his decision on competent evidence that he believed to be reliable from the evidence presented. (*People v. Whitehead* (1987), 116 Ill. 2d 425, 455, *cert. denied* (1987), 484 U.S. 933, 98 L. Ed. 2d 266, 108 S. Ct. 307.) In this case, there is nothing in the record to rebut that presumption.

Furthermore, the testimony by Yancy was merely cumulative of substantial additional material introduced in aggravation. For example, the evidence shows that within 20 days of defendant's release on the Yancy offense, on December 19, 1974, defendant raped a woman in an elevator in the same CHA complex where Yancy was allegedly attacked and where Allen was later murdered. Seven days later, defendant raped another woman in an elevator in the same CHA complex. Defendant was convicted for those rapes and incarcerated in the penitentiary. Within nine days of his release from prison, on May 3, 1978, defendant raped another woman in an elevator in the very same CHA complex. Defendant was convicted again for rape and imprisoned.

Even excluding the Yancy incident, the defendant had been convicted of three other rapes and previously served two prison terms for those offenses. The crimes for which defendant was charged in this case—murder and attempted rape—and the other crimes of which evidence was introduced at trial—armed robbery and rape—all occurred within one month of his release from prison on December 23, 1982.

Thus, even assuming the testimony of Tina Yancy was erroneously admitted, any error is harmless beyond a reasonable doubt. Given the substantial evidence introduced in aggravation, the sufficiency of which is not challenged, the testimony as to which error is alleged could not have prejudiced the trial court or affected the result. Given our resolution of this issue, we need not determine whether the doctrine of collateral estoppel bars admission of the evidence, or whether presentation of the evidence violated the 1974 suppression order, because introduction of the evidence was in any event harmless beyond a reasonable doubt.

Defendant relies upon *Stovall v. Denno* (1967), 388 U.S. 293, 297, 18 L. Ed. 2d 1199, 1204, 87 S. Ct. 1967,

1970, and *United States v. Wade* (1967), 388 U.S. 218, 228-29, 18 L. Ed. 2d 1149, 1158-59, 87 S. Ct. 1926, 1932-33, for the proposition that a conviction based upon a mistaken identification violates a defendant's right to due process. We agree with that general proposition, but find the cited cases to be inapposite to the situation here. The court in *Stovall* and *Wade* condemned suggestive and unfair identification practices which enlist the aid of prejudicial procedures and improper influences to tamper with the tensions and dynamics of the identification process. The identifications at issue in *Stovall* and *Wade* resulted from unfair and suggestive practices, and involved the crimes for which the defendant was then being tried. In contrast, defendant does not claim that the lineup practices used here resulted in an erroneous identification. What defendant contests is the collateral use of Yancy's identification from 10 years ago. The contested identification does not call into question the propriety of this prosecution, as did those in *Stovall* and *Wade*; nor could it, as it is unrelated to the offense for which defendant was on trial. Accordingly, under the circumstances of this case, we find no merit in defendant's contention that the admission of Yancy's testimony was a denial of his due process rights.

It should be noted that, following oral argument in this court, defendant moved, pursuant to Supreme Court Rule 329 (107 Ill. 2d R. 329; see 107 Ill. 2d R. 612(g)), to supplement the record on appeal with the transcript of proceedings in the 1974 Yancy rape case. The motion was taken with this case.

Defendant contends in his motion that the record is insufficient to fully and fairly present the issue regarding the reliability of Yancy's testimony in this case. The State responds that defendant should have presented the transcript in the trial court as that is the proper forum for a party to make his record. We agree with the State.

Supreme Court Rule 329 (107 Ill. 2d R. 329) permits amendments to the record on appeal in order to correct "[m]aterial omissions or inaccuracies or improper authentication." It is not a vehicle through which a party can supplement a record with evidence of other proceedings which was available to him at trial, but which, for some reason, he made no effort to introduce at that time. We can discern no basis for permitting defendant leave to supplement a record on appeal with matters which were never made part of the trial court record. Defendant's motion to supplement the record is therefore denied.

We next consider whether defendant was unduly prejudiced by prosecutorial comments made during closing argument in the second phase of the sentencing hearing. The prosecutor referred to the fact that the victim was pregnant at the time of the offense. Specifically, defendant assigns error to the following comments:

"[PROSECUTOR]: And there's also, of course the fact that that girl was pregnant, at the time. It is not mitigation for him that she wasn't showing enough for him to know. You take your victims as you find them. He not only ended Adrian Allen's life; he ended the life of that unborn baby as well.

* * *

[PROSECUTOR]: No one is ever going to know, Judge, what that baby would have become, what Adrian Allen would have grown up to be.

* * *

[PROSECUTOR]: No remorse even now. No sorrow for ending one life—and he did end one life and whether he knew it or not at the time, he ended a second life—an unborn fetus, five months old, a second life, and not even a weak apology."

Defendant claims that it was improper for the State to argue the victim's pregnancy as an aggravating factor

because her condition was not externally visible and thus defendant was unaware that she was pregnant.

We note initially that two of these allegedly improper comments were not objected to by defendant. It is well established that points not raised in the trial court are deemed waived in review. (*People v. Collins* (1985), 106 Ill. 2d 237, 284, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) Moreover, during the sentencing hearing, Dr. Edmund Donoghue, deputy chief medical examiner of Cook County, testified that the victim was five months' pregnant at the time of the offense. There was no objection to this testimony. Thus, the trial court was fully apprised by evidence, other than that objected to by defendant, of the victim's condition at the time of her murder.

Indeed, defendant's counsel referred to the victim's pregnancy in his closing argument at the sentencing hearing:

"[DEFENSE COUNSEL]: Judge, there's a lot to be said about this particular case. It's sad that a 16 year old died. It is sadder that she was pregnant at the time. *** The State is right about one thing. Two lives were taken in this particular matter ***."

The defendant relies on several cases in support of his contention that the prosecutor's reference to the victim's pregnancy was improper and highly prejudicial. (*People v. Ramirez* (1983), 98 Ill. 2d 439, *cert. denied* (1987), 481 U.S. 1053, 95 L. Ed. 2d 845, 107 S. Ct. 2189; *People v. Davis* (1983), 97 Ill. 2d 1; *People v. Bernette* (1964), 30 Ill. 2d 359.) However, in each of those cases, contrary to the instant case, the jury was responsible for imposing sentence. Here, the trial court presided over the sentencing hearing and because arguments of counsel are not evidence (*Johnson v. Lynch* (1977), 66 Ill. 2d 242, 246), it is presumed that the judge did not rely on the prosecutor's statements in imposing

the death penalty (*People v. Morgan* (1986), 112 Ill. 2d 111, 144-45 (trial judge is presumed to consider only competent evidence and this presumption extends to arguments and remarks of counsel), *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 180, 107 S. Ct. 1329).

"[U]nless it affirmatively appears that the court was misled or improperly influenced to the point that the resulting sentence was contrary to the law and the evidence, we will not reverse." (*People v. Shum* (1987), 117 Ill. 2d 317, 367, *cert. denied* (1988), 484 U.S. 1079, 98 L. Ed. 2d 1022, 108 S. Ct. 1060; *People v. Morgan* (1986), 112 Ill. 2d 111, 144-45.) There is no evidence upon which we could base a conclusion that the trial court had been misled or improperly influenced by the prosecutor's brief remarks concerning the victim's pregnancy made during closing argument.

In a related claim, defendant asserts that it was reversible error to admit into evidence, over his objection, three photographic slides showing the fetus. We disagree.

Whether or not photographs should be introduced into evidence is a question within the sound discretion of the trial court. (*People v. Foster* (1979), 76 Ill. 2d 365, 375-78.) Here, the slides were corroborative of the testimony of the medical examiner as to the victim's pregnancy. Again, that testimony was not objected to by defendant. Moreover, an argument that photographic evidence is inflammatory and prejudicial is less compelling where the trier of fact is a judge sitting without a jury. He is presumed to be less prone to prejudice or influence by the introduction of photographic evidence, especially when it illustrates the testimony of the medical examiner. (*People v. Walcher* (1969), 42 Ill. 2d 159, 164; *People v. Nicholls* (1969), 42 Ill. 2d 91, 99-100, *cert. denied* (1970), 396 U.S. 1016, 24 L. Ed. 2d 507, 90 S. Ct. 578.)

Admission of the photographic slides was not reversible error.

Defendant next claims that the trial court erred in denying his motion in arrest of judgment on the attempted rape charge. Defendant asserts that the indictment failed to sufficiently allege the offense of attempted rape. We again disagree.

The indictment, phrased in the statutory language, alleged that defendant "with the intent to commit the offense of rape, attempted to compel one Adrian Allen, a female not the wife of said Johnnie Lee Evans to submit to an act of sexual intercourse, by force and against her will." We have previously held that an indictment stated in virtually identical language sufficiently alleged the elements of the crime of attempted rape "to enable defendant to prepare his defense and sustain a plea of judgment in bar of any further prosecution for the same offense." (*People v. Bonner* (1967), 37 Ill. 2d 553, 561-62, *cert. denied* (1968), 392 U.S. 910, 20 L. Ed. 2d 1368, 88 S. Ct. 2067; see also *People v. Gold* (1967), 38 Ill. 2d 510, 516, *cert. denied* (1967), 392 U.S. 940, 20 L. Ed. 2d 1400, 88 S. Ct. 2317.) We decline to reconsider that holding.

We recognize that in *People v. Mack* (1974), 24 Ill. App. 3d 455, the appellate court held that an indictment for attempted rape phrased in the statutory language was insufficient to allege an offense. However, that holding is contrary to this court's decision in *Bonner*, as well as at least one other appellate court decision (*People v. Knight* (1985), 139 Ill. App. 3d 188, 195-96, *cert. denied* (1987), 480 U.S. 905, 94 L. Ed. 2d 518, 107 S. Ct. 1346). The other cases upon which defendant relies (see, *e.g., People v. Smith* (1984), 99 Ill. 2d 467 (reckless homicide); *People v. Lutz* (1978), 73 Ill. 2d 204 (aggravated battery); *People v. Pujoue* (1975), 61 Ill. 2d 335 (unlawful use of a weapon)) are inapposite, because in an indict-

ment for attempt the crime intended need not be set out as fully or specifically as would be required for the completed offense. *People v. Williams* (1972), 52 Ill. 2d 455, 460-61.

Finally, defendant makes several claims challenging the constitutionality of the death penalty statute, all of which have previously been resolved against him by this court.

This court has determined that the statutory grant of discretion to the prosecutor in deciding whether to seek the death penalty in a particular case is valid and constitutional (*People v. Orange* (1988), 121 Ill. 2d 364, 390; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603) and that the State need not prove beyond a reasonable doubt the absence of mitigating factors before the death sentence can be imposed (*People v. Johnson* (1987), 119 Ill. 2d 119, 151, *cert. denied* (1988), ____ U.S. ____, 100 L. Ed. 2d 629, 108 S. Ct. 2027; *People v. King* (1986), 109 Ill. 2d at 546; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 68, *cert. denied* (1984), 469 U.S. 894, 83 L. Ed. 2d 207, 105 S. Ct. 271). Similarly, we have held that a proportionality review is not required (*People v. Ashford* (1988), 121 Ill. 2d 55, 82-83; *People v. Guest* (1986), 115 Ill. 2d 72, 111) and that there is no impermissible burden of proof placed upon the defendant to establish mitigating factors (*People v. Orange* (1988), 121 Ill. 2d 364, 390; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 446, *cert. denied* (1985), 474 U.S. 883, 88 L. Ed. 2d 173, 106 S. Ct. 204). We have also determined that sympathy should not be considered as a mitigating factor in a capital sentencing hearing. (*People v. Crews* (1988), 122 Ill. 2d 266, 291-93; *People v. Orange* (1988), 121 Ill. 2d 364, 391; *People v. Johnson* (1987), 119 Ill. 2d 119, 150; *People v. Erickson* (1987), 117 Ill. 2d 271, 303-04, *cert. denied* (1988), 486 U.S.

1017, 100 L. Ed. 2d 216, 108 S. Ct. 1754.) Finally, we have held that the death penalty statute is not unconstitutional for failing to require pretrial notice that the death penalty will be sought. (*People v. King* (1986), 109 Ill. 2d at 547; *People v. Silagy* (1984), 101 Ill. 2d 147, 161-62, *cert. denied* (1984), 469 U.S. 873, 83 L. Ed. 2d 156, 105 S. Ct. 227; *People v. Gaines* (1981), 88 Ill. 2d 342, 369, *cert. denied* (1982), 456 U.S. 1001, 73 L. Ed. 2d 1295, 102 S. Ct. 2285.) Defendant has offered no new reasons for us to reconsider these prior holdings, and we decline to do so.

For the above-stated reasons, we affirm the judgment of the circuit court of Cook County. The clerk of this court is directed to enter an order setting Tuesday, January 17, 1989, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate of this court shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE STAMOS took no part in the consideration or decision of this case.