THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DALE WILLIAMS *et al.,* Defendants-Appellants.

First District (3rd Division) Nos. 1—85—1964, 1—85—2180 cons.

Opinion filed April 4, 1990.

852

854

Donna Finch, of State Appellate Defender's Office, of Chicago, for appellants.

Cecil A. Partee, State's Attorney, of Chicago (Kenneth T. McCurry, James Fitzgerald, and Laura M. Lambur, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a joint jury trial, defendants Mitchell Powers and Dale Williams were convicted of the murder and armed robbery of Darryl Gaston. Defendant Powers was sentenced to serve concurrent sentences of 40 years for murder and 30 years for armed robbery. Defendant Williams was sentenced to serve concurrent sentences of 30 years on each charge.

On appeal, defendant Powers argues that (1) the trial court committed reversible error when it denied his motion to sever and ruled that his codefendant's defense was not antagonistic and (2) the trial

court erred in denying his motion to quash arrest and suppress statements. Additionally, both defendants argue that (1) they were denied their sixth amendment right of confrontation when neither defendant testified and their interlocking statements were introduced at trial; (2) they were denied their right to a fair trial when the State elicited irrelevant testimony from the victim's mother and attempted to shift the burden of proof in closing argument; (3) the trial court erred in excluding the testimony of a defense witness; and (4) the trial court abused its discretion in sentencing. We modify and affirm.

On August 19, 1983, at approximately 4 a.m., Darryl Gaston, a clerk at a Chicago Heights White Hen Pantry store, was robbed at gunpoint and shot three times. Gaston died as a result of his injuries. Two witnesses arrived at the store shortly after the shooting. The witnesses saw a man run around the side of the building as they parked their car. After they parked, they observed another man jump over the service counter and run from the store carrying a paper bag and a gun. Both witnesses viewed photographs, but were unable to positively identify the offenders. The witnesses tentatively identified one person, who was arrested, but later released when further investigation led the police to Powers and Williams.

At trial, Officer Ted Nagorski, an evidence technician, testified that when he arrived at the crime scene, he observed cigarette packages in disarray on the floor and counter. He further testified that he recovered latent fingerprints from the counter area, cash register, a plastic counter sign and a broom handle. Nagorski also recovered a shoe impression from the top of the counter.

The victim was found lying facedown in a pool of blood on the floor behind the service counter. Dr. Barry Lifschultz, a forensic pathologist employed by the Cook County medical examiner's office, testified that his autopsy of the victim revealed gunshot wounds to the left chest, left abdomen and right back of the head. Dr. Lifschultz opined that the gunshot wounds caused Gaston's death. The three bullets removed from the victim's body during the autopsy were later determined to have been fired from a .22 caliber weapon.

Detective Brian Smith testified that on August 21, 1983, the owner of a Chicago Heights store gave him two checkbooks and a social security card bearing the name of Darryl Gaston which he found in the alley behind his store. He further testified that on August 25, he received information that a phone call made to the We Tip Witness Anonymous Hotline named Lavelle Williams and Michael Mitchell as possible suspects in the White Hen Pantry murder because they were overheard discussing the crime. Smith interviewed Lavelle and learned that

Mitchell Powers told him that he had committed the crime. Following the interview, Smith told youth officer Gary Miller that Mitchell Powers was a possible suspect in the White Hen Pantry murder.

At the pretrial hearing on defendant Powers' motion to quash arrest and suppress statements, the following evidence was adduced. On August 26, 1983, at approximately 7:20 p.m., Chicago Heights police officers Fiaoni and Crescenti responded to a call of a disturbance at 447 West Hickory Street. When they arrived, they learned from Boris Princeton that he had been beaten by four youths. Princeton led the police to the offenders and identified them. The officers arrested Darryl Williams, defendant Powers, his brother Michael Powers and Ramon Cardenas for the battery of Princeton.

Youth officer Gary Miller testified that he was contacted at home and informed that defendant Powers, a juvenile, had been brought into the station. Miller arrived at the station at approximately 8 p.m. At approximately 10 p.m., Miller contacted Detective Smith at home and informed him that defendant Powers had been taken into custody for battery. Smith arrived at the station at 10:30 p.m. and talked to Darryl Williams at approximately 11 p.m. Darryl Williams informed Smith that defendant Powers told him that he shot the White Hen Pantry clerk and that his brother, defendant Dale Williams, was his accomplice. Smith also interviewed Ramon Cardenas, who told him that he gave defendant Powers a gun for use in the robbery and that both defendants later reenacted the murder while the three were at defendant Williams' home. Cardenas related that the defendants told him that they were going to rob a Dunkin Donuts, but decided on the White Hen Pantry when they saw a security camera at the other location. Cardenas also told Smith a detailed account of the robbery and shooting which the defendants had related to him. Cardenas' account of the crime matched the evidence obtained from police investigation of the crime scene.

At approximately midnight, Smith interviewed defendant Powers, who orally admitted his participation in the robbery and murder of Gaston and named defendant Williams as his accomplice. Powers told Smith that he borrowed a .22 caliber revolver from Cardenas and gave Williams a hunting knife. He further stated that after they entered the White Hen Pantry, he grabbed the store clerk and took him to the rear of the store while Williams went behind the counter and attempted to open the cash register. When Williams failed to open the cash register, Powers brought the victim to the cash register and demanded that he open it. When the victim appeared to be stalling, Powers fired the gun to frighten him, but the bullet struck him in the

abdomen. Powers then fired two more shots, striking the victim in the chest and head. Powers grabbed some cigarettes from the counter, removed the victim's checkbooks from his pocket, jumped over the counter and ran from the store. Powers stated that after the robbery, he and Williams went to his home. At about 9 a.m. the following morning, both defendants went to Williams' home, where they reenacted the shooting for Lavelle Williams and burned the victim's driver's license in the kitchen sink. Powers later refused to give a court-reported statement.

When Smith questioned Darryl Williams, Williams told Smith that his brother, defendant Dale Williams, was at home. Thereafter, Smith, Miller and four other officers arrested defendant Williams at his home at approximately 1:45 a.m. on August 27. Defendant Williams later gave a court-reported statement admitting his participation in the armed robbery and murder of Gaston and naming defendant Powers as his co-offender.

In his statement, Williams related that on the morning of August 19, 1983, he and defendant Powers went to the White Hen Pantry store in Chicago Heights. He stated that defendant Powers was armed with a .22 caliber gun which he got from Cardenas, while he had a knife which he got from Powers. He stated that after they entered the White Hen Pantry, Powers took the clerk to the back of the store while he attempted to open the cash register. Williams further stated that Powers shot the victim three times, once in the stomach, once in the chest and, after Gaston fell on the floor, Powers fired a third shot into the back of his head. Williams stated that after the victim fell to the floor, he grabbed some socks and $35 and left the store. He stated that Powers returned the gun to Cardenas at a party the following night. Following the hearing, the trial court denied defendant Powers' motion to quash arrest and suppress statements.

Prior to trial, both defendants made motions to sever. After argument, the court denied the motions and ruled that the jury would be instructed regarding the defendants' interlocking statements so that they would not be denied a fair trial. Thereafter, defendant Powers made an amended motion to sever and further arguments were heard. Defendant Powers argued that his defense of alibi and defendant Williams' defense of withdrawal were antagonistic. The court denied Powers' amended motion to sever. Both defendants' statements were introduced into evidence at trial, and the jury was instructed that each statement should only be used as evidence against the person who made it.

At trial, the victim's mother testified regarding her son's aca-

demic achievements, work habits and personality. Both defendants objected, and the trial court allowed the testimony to stand. The State also called fingerprint examiner David Grieve to testify. Grieve testified that defendant Powers' fingerprint was found on one of the victim's checkbooks. He also testified that defendant Williams' fingerprints were found on the White Hen Pantry store counter and on a store counter sign.

Prior to the close of their case in chief, the State made a motion *in limine* to bar defense witness Dr. Ira Asher's testimony. Defendants planned to call Dr. Asher to testify that he treated Ramon Cardenas for injuries he received while in police custody. After a hearing, the court granted the State's motion *in limine* and barred Asher's testimony.

Gerriata Warr testified on behalf of Dale Williams and related that on August 19, 1983, at approximately midnight, she and defendant Williams went to the Chicago Heights White Hen Pantry store to purchase aspirin. She stated that Williams touched both the counter and a sign while they were in the store. Ms. Warr testified that after they left the store, defendant Williams walked her home, they talked for a while and then went to Williams' home. Neither defendant testified at trial. Following instructions, the jury retired to deliberate. Both defendants were convicted of murder and armed robbery.

During defendant Williams' sentencing hearing, the State recommended that due to the wanton cruelty associated with the victim's death, defendant should be sentenced to natural life, consecutive sentences or an extended term. Defendant Williams recommended that based on his age and lack of prior felony convictions, he should receive a minimum sentence. At defendant Powers' sentencing hearing, the State recommended that due to the heinous nature of defendant's murder of the victim, he should be sentenced to either natural life or consecutive sentences. Defendant Powers argued that his youth and lack of prior criminal history were indicative of his rehabilitative potential. The court sentenced defendant Williams to concurrent terms of 30 years for each offense and defendant Powers to 40 years on the murder charge and 30 years on the armed robbery charge, to be served concurrently. This appeal followed.

Defendant Powers first argues that the trial court committed reversible error when it denied his motion to sever and ruled that codefendant Williams' defense was not antagonistic. We disagree.

■■■ The general rule is that defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice. (*People v. Lee* (1981), 87 Ill. 2d 182, 187,

429 N.E.2d 461, 463.) A pretrial motion to sever must demonstrate how the defendant is going to be prejudiced by proceeding with a joint trial, and mere apprehensions of prejudice are not enough. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 541, 468 N.E.2d 969, 972.) In ruling on the motion for severance, the trial judge must make a prediction about the likelihood of prejudice at trial, taking into account the papers presented, the arguments of counsel, and any other knowledge of the case developed from the proceedings. (*Daugherty*, 102 Ill. 2d at 541.) The decision to grant a separate trial is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. (*Lee*, 87 Ill. 2d at 186.) Where the codefendants' defenses are so antagonistic to each other that one of the defendants cannot receive a fair trial jointly with the other, severance is required. (*People v. Bean* (1985), 109 Ill. 2d 80, 93, 485 N.E.2d 349, 355.) However, actual hostility between the two defenses is required. (*Bean*, 109 Ill. 2d at 93.) Actual hostility has been found where the trial becomes more of a contest between the codefendants than the State and the defendants or where one defendant proclaims his innocence while pointing to his codefendant as the true perpetrator. *People v. Byron* (1987), 116 Ill. 2d 81, 92-93, 506 N.E.2d 1247, 1252; *Bean*, 109 Ill. 2d at 94-95.

■ In the present case, prior to trial, defendant Williams indicated that he intended to assert the defense of reasonable doubt and/or withdrawal. Defendant Powers asserted that his defense would be alibi. Based on these proposed defenses, defendant Powers asserted in his pretrial motion for severance that these defenses were antagonistic and that the defendants should be granted separate trials. After argument, the court denied the motion and ruled that it would instruct the jury that each defendant's statement could only be used as evidence against its maker. During the trial, both defendants essentially relied on the defense of reasonable doubt by attacking the credibility of the State's witnesses and evidence and pointing out the discrepancies therein. At no time during the trial did the defendants become opponents or pass the buck to their codefendant while proclaiming their own innocence. Thus, the antagonism and resultant prejudice which defendant Powers alleged in his motion to sever never manifested itself at trial. We therefore conclude that the trial court's finding that the defendants' defenses were not antagonistic was not erroneous and, thus, the court did not abuse its discretion in denying defendant Powers' motion to sever.

Defendant Powers next argues that the trial court erred in denying his motion to quash arrest and suppress statements. It is his posi-

tion that when he was detained and questioned regarding the White Hen Pantry murder and armed robbery, following his arrest for battery, the police lacked probable cause to arrest him for those offenses. We disagree.

■■ ■ Probable cause to arrest exists where the police have knowledge of facts which would lead a reasonable man to believe that a crime has occurred and that it was committed by the defendant. (*People v. Wright* (1985), 111 Ill. 2d 128, 145, 490 N.E.2d 640, 646.) The existence of probable cause must be determined from the totality of the circumstances. (*People v. Lekas* (1987), 155 Ill. App. 3d 391, 410, 508 N.E.2d 221, 234.) Further, where a defendant is initially arrested on a charge, the police are not precluded from investigating other, unrelated charges involving the defendant. (*People v. Evans* (1988), 125 Ill. 2d 50, 72, 530 N.E.2d 1360, 1369.) A trial court's determination as to whether probable cause to arrest exists will not be disturbed unless it is manifestly erroneous. *Evans*, 125 Ill. 2d at 71.

In the present case, the Chicago Heights police force was informed via an anonymous telephone tip that Michael Mitchell and Lavelle Williams were overheard discussing the White Hen Pantry robbery and murder. Following this tip, Detective Smith talked with Williams, who informed him that defendant Powers had admitted to him that he had robbed and shot Darryl Gaston. Williams' description of the crime scene and of some of the evidence which defendant Powers destroyed in his presence matched the evidence that the police had regarding the actual scene. After receiving this information, Smith related it to youth officer Miller, and the two agreed to pursue an arrest warrant the following day. At that time, the police officers had probable cause to arrest defendant Powers for the murder and armed robbery of Darryl Gaston.

Defendant Powers was arrested on an unrelated battery charge the following day, and youth officer Miller was summoned to the police station because defendant was a juvenile. When Officer Miller discovered that Powers was also a suspect in the White Hen Pantry robbery and murder, he contacted Detective Smith, who was in charge of the murder investigation. Smith arrived at the police station and interviewed Darryl Williams and Ramon Cardenas, who both told him that defendant Powers had told them of his involvement in the White Hen Pantry robbery and murder. After Smith interviewed defendant Powers, Powers made an oral statement admitting his involvement, but refused to give a court-reported statement.

■■ Defendant argues that the police detention following his arrest for battery was in fact a murder arrest which lacked probable

cause. However, the police were not precluded from detaining and questioning Powers about the White Hen Pantry armed robbery and murder while he was under arrest for an unrelated charge and a key suspect in the murder. Further, the police continued to gather information about the murder and armed robbery from Darryl Williams and Ramon Cardenas while defendant Powers was in custody. Under these circumstances, the police had probable cause to detain and later arrest Powers for the armed robbery and murder of Gaston. We therefore conclude that the trial court did not err in denying defendant Powers' motion to quash arrest and suppress statements.

Both defendants argue that they were denied their sixth amendment right to confrontation when neither defendant testified and their interlocking statements were introduced at trial. We disagree.

■■ ■ Where a nontestifying defendant's out-of-court statements implicating his codefendant are introduced at their joint trial, the codefendant's sixth amendment right of confrontation may be violated even though the jury is instructed to only consider the statement as substantive evidence against its maker. (*Bruton v. United States* (1968), 391 U.S. 123, 126, 20 L. Ed. 2d 476, 479, 88 S. Ct. 1620, 1622.) In order for a codefendant's pretrial statement to be admissible as substantive evidence against a defendant at trial, it must be supported by sufficient indicia of reliability to rebut the presumption that an accomplice's confession that incriminates a codefendant is unreliable. *Lee v. Illinois* (1986), 476 U.S. 530, 543, 90 L. Ed. 2d 514, 527, 106 S. Ct. 2056, 2063.

■■■■ Where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the confrontation clause bars its admission at their joint trial even if the jury is instructed not to consider it against the defendant and even if the defendant's own confession is admitted against him. (*Cruz v. New York* (1987), 481 U.S. 186, 193, 95 L. Ed. 2d 162, 171-72, 107 S. Ct. 1714, 1719.) However, although a codefendant's interlocking confession incriminating the defendant may not be admitted at trial, the defendant's own confession may be considered in assessing whether his codefendant's statements are supported by sufficient indicia of reliability to be directly admissible against him (assuming the unavailability of the codefendant), despite the lack of opportunity for cross-examination, and may be considered on appeal in assessing whether any confrontation clause violation was harmless. (*Cruz*, 481 U.S. at 193-94, 95 L. Ed. 2d at 172, 107 S. Ct. at 1719.) Further, where codefendants' pretrial statements interlock on some points, but diverge in many important respects, such as the roles played by the

two defendants in the crimes for which they were charged, without an opportunity for cross-examination, the statements are presumptively unreliable and inadmissible as substantive evidence. *People v. Mahaffey* (1989), 128 Ill. 2d 388, 410-11, 539 N.E.2d 1172, 1182-83.

In the present case, the defendants' statements were admitted at trial as substantive evidence against the defendant who made the statement. The statements were not used as substantive evidence of their co-offenders' guilt, and the jury was so instructed. However, under *Bruton* the defendants' sixth amendment right of confrontation may still have been violated. The U.S. Supreme Court decision in *Cruz* also prohibits the introduction of a nontestifying codefendant's pretrial statement, even where the jury is given limiting instructions and the defendant's own statement is introduced against him at trial. However, both decisions provide for an exception to inadmissibility where the statement is supported by sufficient indicia of reliability or the error caused by its introduction is harmless. *Lee*, 476 U.S. at 543, 90 L. Ed. 2d at 527, 106 S. Ct. at 2063; *Cruz*, 481 U.S. at 193-94, 95 L. Ed. 2d at 172, 107 S. Ct. at 1719.

 First, we will examine the defendants' statements under the indicia of reliability test. Defendant Powers' oral statement, which was introduced at trial through the testimony of Detective Smith, included the same details which defendant Williams admitted in his court-reported statement. Both defendants stated that Powers was armed with a .22 caliber weapon which he got from Cardenas, while Williams had a knife which he got from Powers. Both defendants stated that Powers took the clerk to the back of the store at gunpoint while Williams attempted to open the cash register. Both defendants stated that when Williams was unable to open the cash register, defendant Powers brought the store clerk to the front of the store and then shot the clerk three times: once in the stomach, once in the chest and once in the head. Powers stated that he removed the victim's checkbooks from his pocket and some cigarettes from the counter, while Williams stated that he took $35 and some socks before leaving the store. In sum, the defendants' statements do not diverge or contradict each other in any way. Because both defendants' statements agree with respect to the roles they each played in the crimes for which they were charged and are identical in all material respects, we find that the interlocking nature of the defendants' statements tends to rebut the presumption of unreliability. *Mahaffey*, 128 Ill. 2d at 410.

 The defendants' statements were further corroborated by independent evidence from the crime scene which demonstrated that (1)

the victim was shot in the manner which the defendants described; (2) the body was found behind the service counter, near the cash register; (3) one of the victim's checkbooks was found with defendant Powers' fingerprint on it; (4) defendant Williams' fingerprints were found on the store counter and sign; and (5) the police found cigarette packages in disarray on the floor and counter. Since a confession tending to demonstrate that the defendant committed the crime, in addition to proof of death caused by the criminal agency of another, is sufficient to justify a conviction, we find the defendants' statements to be sufficiently corroborated. *People v. Dodds* (1989), 190 Ill. App. 3d 1083, 1096, 547 N.E.2d 523, 533.

The circumstances surrounding the confessions also tend to rebut the presumption that the defendants' statements are unreliable. Both Powers and Williams gave statements soon after being questioned regarding their involvement in the murder and armed robbery. Although Powers was held in custody for four hours following his arrest for battery, he was not questioned regarding his involvement in the White Hen Pantry incident until midnight and he gave his oral statement shortly thereafter. Likewise, defendant Williams was arrested at approximately 1:45 a.m., and gave his court-reported statement at approximately 5:20 a.m. In addition, there is no evidence provided by either the defendants' statements or otherwise that either defendant demonstrated a desire, motive or impulse to either mitigate the appearance of his own culpability by spreading the blame or overstate his codefendant's involvement in order to retaliate. We therefore conclude that the circumstances surrounding the defendants' confessions also tend to rebut the presumption that their statements are unreliable.

While we find the admission of the defendants' interlocking pretrial statements in which they implicated each other, in a joint trial without opportunity for cross-examination, to have been error, after assessing the reliability of the statements and concluding that they are supported by sufficient indicia of reliability, we find the error to be harmless. We therefore conclude that the defendants were not denied their sixth amendment right of confrontation by the admission of their interlocking pretrial statements.

Defendants next argue that they were denied their right to a fair trial when the State elicited irrelevant testimony from the victim's mother and attempted to shift the burden of proof during closing argument. We disagree.

Where testimony in a murder case respecting the fact that the deceased has left a family is not elicited incidentally, but is

presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury is instructed to disregard the evidence. (*People v. Hope* (1986), 116 Ill. 2d 265, 275, 508 N.E.2d 202, 206.) In determining whether reversal is required, several factors should be considered, such as: (1) the sufficiency of the evidence against the defendant; (2) the severity of the sentence imposed; (3) whether the evidence was presented in such a manner as to cause the jury to believe it to be material; and (4) whether the evidence was presented in an effort to relate it to defendant's punishment. (*People v. Falkner* (1985), 131 Ill. App. 3d 706, 713-14, 475 N.E.2d 964, 969.) However, since murder victims often leave behind family members, every mention of a deceased's family does not *per se* entitle the defendant to a new trial.

In certain instances, depending on how this evidence is introduced, such a statement can be harmless; this is particularly true when the death penalty is not imposed. (*Hope*, 116 Ill. 2d at 276.) In addition, the court should also consider the desirability of affirming the conviction of an obviously guilty defendant and weigh this factor against the danger of deteriorating our procedural safeguards by ignoring their breach. *Falkner*, 131 Ill. App. 3d at 714.

Defendants allege as error the admission of portions of the testimony of the victim's mother, Mary Gaston. At trial, Ms. Gaston testified that in addition to his job at White Hen Pantry, her son also held two other part-time jobs. She further testified that he graduated first in his class in high school and was in his third year in college, where he was also first in his class. Ms. Gaston also testified that the last time she saw her son alive was when he dropped her off at the bus station before she left for vacation in Tulsa, Oklahoma. It is the defendants' contention that this testimony was offered by the State to arouse the sympathies and passions of the jury and that its admission resulted in substantial prejudice to defendants.

■■■ After reviewing the applicable factors as they apply to the instant case, we conclude that the introduction of evidence that the deceased worked several part-time jobs, was academically successful, and helpful to his mother was not reversible error. Defendants have not challenged the sufficiency of the evidence against them. There is ample evidence in the record to support the defendants' convictions for murder and armed robbery. Further, the evidence was introduced through a series of questions and only tangentially referred to in closing argument. Thus, it cannot be said that the evidence was presented in such a manner as to cause the jury to believe it to be material, or

that it was presented in an effort to relate it to the defendants' punishment. Accordingly, the introduction of this evidence was not reversible error.

Defendants further argue that their right to a fair trial was denied when the prosecution attempted to shift the burden of proof in closing argument. We disagree.

■■ Where a prosecutor's statements in summation are not relevant to the defendant's guilt or innocence and can only serve to inflame the jury, the statements constitute error. (*People v. Caballero* (1989), 126 Ill. 2d 248, 533 N.E.2d 1089, 1097.) However, comments on the evidence and the strength of the State's case are permissible. *People v. Adams* (1985), 109 Ill. 2d 102, 118, 485 N.E.2d 339, 344.

■■ Defendants complain that the prosecutor's comment that the evidence of the defendants' guilt was overwhelming and that their defense counsel had not argued that they were innocent was prejudicial error although the trial court sustained their objection to the statements. It is their position that these statements were an attempt on the part of the prosecution to shift the burden of proof to the defendants and that it denied them their right to a fair trial. After an examination of the record as a whole, we find that while the prosecutor's statement regarding defense counsel's failure to proclaim the defendants' innocence was clearly improper, any error caused was cured by the trial court's sustaining of the defendants' objection and its subsequent instructions to the jury regarding the burden of proof. We therefore conclude that the defendants were not denied their right to a fair trial.

■■ Defendants next argue that the trial court erred in excluding the testimony of a defense witness. We disagree. The trial court is given broad discretion in ruling on issues of relevancy and materiality and its decision will not be reversed absent an abuse of discretion. (*People v. Anderson* (1985), 134 Ill. App. 3d 80, 479 N.E.2d 1164, 1177.) Prior to trial, the court granted the State's motion to bar the testimony of defense witness Dr. Ira Asher because it found that the proposed testimony regarding his treatment of Ramon Cardenas for injuries allegedly sustained in police custody was not relevant to the trial. After viewing the record, we find it to be devoid of any evidence of the defendants having been coerced to confess due to knowledge of Cardenas' alleged beating or of evidence that either defendant saw or had any contact with Cardenas while they were in police custody. Under these circumstances, we find that the trial court did not err in granting the State's motion *in limine* to bar the testimony of Dr. Asher.

■■■ Defendants finally argue that the trial court abused its discretion in sentencing. We agree. A sentence of not less than 20 years and not more than 40 years may be imposed for murder, while a sentence of not less than 6 years and not more than 30 years may be imposed for the offense of armed robbery. (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—8—1(a)(2)(a), (a)(3).) Pursuant to Supreme Court Rule 615(b)(4), we have the discretionary power to reduce an excessive sentence, although a trial court's sentencing decision will not be disturbed absent an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883; 107 Ill. 2d R. 615(b)(4).) The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, §11.) Thus, an abuse of discretion may be found even where the sentence is within statutory limitations, if it is greatly at variance with the purpose and spirit of the law. *People v. Steffens* (1985), 131 Ill. App. 3d 141, 151, 475 N.E.2d 606, 615.

Defendants argue that the trial court abused its discretion by not taking into consideration their ages, lack of substantial criminal histories and rehabilitative potential. We agree. The record reveals that when the offenses were committed, defendant Williams was a 17-year-old high school student with no prior felony convictions whose only prior arrests had been for misdemeanor shoplifting. Williams' presentence report further revealed that (1) he was one of seven children raised by his widowed mother and grandparents; (2) he was pursuing his GED certificate while in jail; (3) he participated in sports activities while attending high school and received an award for most improved student; and (4) he expressed a desire to return to school and become an auto mechanic. In short, the record reveals a young man with substantial rehabilitative potential.

■■■ In addition, an examination of the nature and circumstances of the offense as well as the history and character of the defendant are governing factors. (*People v. Gibbs* (1977), 49 Ill. App. 3d 644, 649, 364 N.E.2d 491, 494.) With respect to the nature and circumstances of the particular offense, we note that while defendant Williams was found legally accountable for the acts of his co-offender, the evidence demonstrated that he did not fire the weapon which resulted in the victim's death. In light of the circumstances surrounding the offense and Williams' participation as an accomplice, we believe that the defendant's rehabilitative potential was not given sufficient consideration. We therefore find the trial court's sentence of 30 years for murder and 30 years for armed robbery to be excessive. Accordingly,

under the authority of Supreme Court Rule 615(b)(4), we reduce defendant Williams' sentence for murder and armed robbery to 20 years on each count to be served concurrently.

As to defendant Powers, the record reveals that at the time the offenses were committed he was a 15-year-old high school student who lived at home with his mother and two other siblings and was active in school track and field sports activities. Powers had no prior criminal history other than the juvenile arrest for battery which occurred on the date of his murder and armed robbery arrest. Although the evidence demonstrated that Powers fired the weapon which resulted in the victim's death, his statement indicates that he initially fired the gun in order to "scare" the victim, but instead shot him. In light of these circumstances and Powers' youth and lack of prior criminal history, we find that the trial court failed to give proper consideration to his rehabilitative potential and that the sentence of 40 years for the offense of murder is excessive. Accordingly, pursuant to Supreme Court Rule 615(b)(4), we reduce defendant Powers' sentence for murder to 30 years to be served concurrently with his 30-year armed robbery sentence.

Accordingly, the judgment of the circuit court of Cook County is affirmed as modified.

Affirmed as modified.

CERDA, P.J., and FREEMAN, J., concur.