THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CARLOS MOORE, Defendant-Appellant.

First District (5th Division) No. 1—80—1615

Opinion filed February 26, 1993.

Dennis Doherty, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Sharon Heath, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Defendant Carlos Moore (Moore) was tried jointly with codefendants Ulysses Edwards, Willie Oliver and Lorenzo Wiley for the murder and attempted armed robbery of William Kelly. The murder occurred in Kelly's apartment on Chicago's near north side in 1978, more than 14 years ago. A jury found Moore and the three other defendants guilty as charged after a July 1979 trial. Moore was then sentenced to concurrent terms of 80 years for murder and 15 years for attempted armed robbery.

The convictions of codefendants Edwards, Wiley and Oliver were affirmed by this court in an order dated May 21, 1982, issued pursuant to Supreme Court Rule 23 (87 Ill. 2d R. 23), meaning that the decision was unreported and of no precedential value. (See consolidated case Nos. 1—79—2469, 1—80—1404.) Moore, too, filed a timely appeal from his convictions and sentence; however, his appeal was dismissed for want of prosecution in 1980 after his retained counsel failed to file a docketing statement.

In 1983 the Attorney Registration and Disciplinary Commission (ARDC) suspended defendant's attorney for 18 months, due in part to his neglect of defendant's appeal. Thereafter, Moore moved to have his appeal reinstated and, in 1990, the Illinois Supreme Court ordered Moore's direct appeal to this court reinstated. (See *People v. Moore* (1990), 133 Ill. 2d 331, 549 N.E.2d 1257.) Moore's appellate brief was then filed in this court on April 23, 1991, the State's response was filed November 22, 1991, and Moore's reply was filed January 28, 1992.

The case languished in this court until December 1992, at which time the case became the responsibility of newly seated appellate judge Justice Cousins, who had presided over the trial in 1978. Consequently, Justice Cousins recused himself from the case. In January 1993, nearly 15 years after Kelly's death, oral argument was held on Moore's appeal for the first time. For reasons that follow, we now affirm Moore's convictions and sentence.

On appeal Moore does not deny his involvement in Kelly's murder and attempted robbery. Instead he seeks a new trial, based upon certain alleged procedural errors, or a reduction of his sentence. The issues raised are: (1) whether Moore should be entitled to a new trial because a nontestifying codefendant's confession was admitted into evidence at the joint trial, even though Moore's own confession was also admitted; (2) whether the State failed to prove that Moore's confession was voluntary; (3) whether Moore's trial counsel labored under an actual conflict of interest due to his joint representation of Moore and codefendant Wiley; (4) whether Moore was denied due process of law because the trial court barred the testimony of two witnesses tendered by the defense; and (5) whether Moore's extended-term sentence was improper and excessive.

The first issue is whether defendant was denied a fair trial because a nontestifying codefendant's statement was admitted into evidence, not as evidence against Moore but as evidence against that codefendant. The record shows that prior to trial all of the defendants moved for severance, which was denied, and that they were then tried jointly. Moore and Wiley were jointly represented by a single attorney, while Edwards and Oliver were jointly represented by another attorney. Each of the codefendants made both oral and written inculpatory statements subsequent to arrest, which were admitted as evidence against them at trial. Moore, Wiley and Edwards each testified in their own defense at trial, each claiming that their statements were not true and that the police had coerced them into making the statements. Oliver did not testify at trial. However, his defense counsel

adopted the same position, *i.e.*, that Oliver's statement had been coerced.

Relying on *Cruz v. New York* (1987), 481 U.S. 186, 95 L. Ed. 2d 162, 107 S. Ct. 1714, Moore contends that his right of confrontation, guaranteed to him through the sixth and fourteenth amendments of the United States Constitution, was violated and that he was denied a fair trial because Oliver's statement was admitted into evidence at the joint trial although Oliver did not testify and, therefore, was not subject to cross-examination. In addition, Moore claims that he was further denied a fair trial due to the admission of Edwards' and Wiley's statements because, although they testified at trial, Moore's trial counsel did not cross-examine them.[1] Furthermore, Moore contends that the admission of the codefendants' statements violated Illinois evidentiary law.

Although defendant declares that the above-cited errors occurred, he does not demonstrate the error in the context of his case. Moore cites to relevant case law concerning these claims, but does not relate the case law to the facts of this case. When doing so it is clear that Moore's claims are without merit.

As a general proposition, defendants who are indicted jointly should be tried jointly, especially where the crime involves a common scheme or plan. (*People v. Lincoln* (1987), 157 Ill. App. 3d 700, 510 N.E.2d 1026.) However, under certain circumstances, substantial fairness may require a different result. In 1968 the United States Supreme Court determined one such circumstance. (See *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) In the *Bruton* case two defendants were tried jointly for armed robbery. One of the defendants confessed and inculpated the other, the other defendant made no admission of guilt. The *Bruton* Court held that under these circumstances it was unfairly prejudicial to defendant, notwithstanding any cautionary or limiting instructions that might be given to the jury, to admit codefendant's incriminating state-

---

[1]Moore contends on appeal that he was restricted from cross-examining codefendants Wiley and Edwards. However, this statement is somewhat misleading. The trial court did restrict Moore's counsel from cross-examining codefendant Edwards' mother. The court's dialogue concerning this matter reveals that the court limited cross-examination by Moore's counsel because it would be duplicative of cocounsel's direct examination. There is no indication that Moore's counsel ever attempted to cross-examine Edwards.

Finally, it is important to remember here that Moore's counsel also represented Wiley. Therefore, Moore's counsel did not cross-examine him, but instead, directed the examination of this witness.

ment during the joint trial if codefendant also failed to testify at trial. The Court reasoned that this evidence violated defendant's sixth amendment right of confrontation because there was too great a risk that this evidence, though not admitted against defendant directly, would be considered by the jury when assessing his guilt or innocence. Furthermore, this evidence, though devastating to defendant's case, was inherently unreliable. There was a high probability that codefendant would want to shift or spread blame, yet his motives could not be tested through cross-examination.

Some years later, an exception to the *Bruton* rule was set forth by a divided Supreme Court in the plurality decision authored by Justice Rehnquist, *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132. According to the decision in *Parker*, the *Bruton* rule was not violated and reversal of a defendant's conviction was not mandated if the defendant also made a confession and his confession "interlocked" with the nontestifying codefendant's confession which implicated him.[2]

*Parker* was the law at the time of Moore's trial. Consequently, when ruling on defendants' motions for severance the trial court considered the fact that the confessions of all four codefendants in this case were substantially identical or "interlocking" and concluded that severance was not necessary because, whether or not any of the defendants testified, the admission of their confessions would not be error under the *Parker* exception to the *Bruton* rule.

Thereafter, the four codefendants were jointly tried and the oral and written confessions of each of the defendants were introduced at trial. Moore, Wiley and Edwards chose to testify at trial, denying the truth of the confessions and contending that the police had coerced them into making the statements. The jury was instructed to consider each confession only against the person who made it.

Had Moore's appeal proceeded normally, the introduction of the contents of each codefendants' out-of-court statements, most likely, would not have been an issue based on the *Parker* opinion. However, during the interim between defendant's conviction and this appeal,

---

[2]A plurality of four justices found no sixth amendment violation. The remaining four justices who considered the case subscribed to Justice Blackmun's view, that the introduction of a nontestifying codefendant's confession was a violation of the sixth amendment and error under the *Bruton* case, but that the error could be rendered harmless by the introduction of defendant's own interlocking confession. In *Parker*, Justice Blackmun did, in fact, find the error to be harmless, thereby producing a majority for affirmance.

the United States Supreme Court decided the *Cruz* case, wherein the Court decided to adopt Justice Blackmun's approach to the admission of nontestifying codefendants' interlocking confessions, as set forth in *Parker*. (See *Cruz v. New York* (1987), 481 U.S. 186, 95 L. Ed. 2d 162, 107 S. Ct. 1714.) Thus, according to *Cruz*, the admission of a nontestifying codefendant's extrajudicial statement violates a defendant's sixth amendment right of confrontation and constitutes reversible error, unless the statement bears sufficient indicia of reliability for it to be independently admitted against defendant or its admission is deemed harmless beyond a reasonable doubt. See also *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056.

Moore seeks to take advantage of the change in the law brought about by the decision in *Cruz*, and the State does not argue that *Cruz* is inapplicable to this appeal. (See *Graham v. Hoke* (2d Cir. 1991), 946 F.2d 982 (the *Cruz* rule is to be applied retroactively); *People v. Kubik* (1991), 214 Ill. App. 3d 649, 573 N.E.2d 1337.) Nonetheless, the State argues that, under the attendant circumstances of this case, it was not error to have admitted Oliver's statement at trial. Citing to *Lee v. Illinois*, the State contends that there were sufficient indicia of reliability for Oliver's confession to have been admitted against Moore as substantive evidence. Alternatively, the State argues that any error that may have resulted from the admission of Oliver's statements at trial was harmless beyond a reasonable doubt. In addition, because the admission of Oliver's statement did not constitute prejudicial error, the State argues that Illinois constitutional and evidentiary law was not abrogated.

■ After considering all of the arguments presented by both parties we find that, despite the applicability of the *Cruz* rule to the present case, Moore is not entitled to a new trial. First of all, defendant provides no support for the theory that his rights protected under State and Federal constitutional law were violated by the admission of the confessions of Wiley and Edwards, both of whom testified at trial. In fact, the only case cited by defendant, *People v. Jones* (1988), 121 Ill. 2d 21, 520 N.E.2d 325, holds that when codefendants take the stand and repudiate their earlier statements which inculpate a defendant there is no need for cross-examination since the repudiation is more favorable than any cross-examination could possibly be. Moore seeks to distinguish this case from *Jones*, claiming that there was a conflict of interest (Moore's third issue on appeal); however, for reasons that we will discuss later on in this opinion, we do not agree that a conflict existed. Therefore, we find the *Jones* case directly applicable to the case at bar and conclude that the admission of Edwards'

and Wiley's statements did not offend either State or Federal law. See *People v. Collins* (1989), 184 Ill. App. 3d 321, 539 N.E.2d 736 (only nontestifying codefendant's statements constitute inadmissible hearsay under Illinois law and reversible error results only if admission of the statement is found to be prejudicial error).

Secondly, the *Cruz* court makes it clear that when the inculpatory statements of a nontestifying codefendant are admitted at a joint trial, reversal of the conviction is not mandated. If there are sufficient indications that a statement is reliable, it may be directly admissible against the defendant. (See *Lee v. Illinois*, 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056; *Ohio v. Roberts* (1980), 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531.) Alternatively, the circumstances of the case may be analyzed under the harmless error rule.

 When considering the facts of this case we find that, under Federal evidentiary standards, Oliver's statement could have been admitted as substantive evidence against Moore since there was ample evidence that Oliver's statements were reliable. Furthermore, any error that may have derived from the admission of Oliver's statements and any prejudice that might have inured to Moore as a result were harmless beyond a reasonable doubt. The evidence adduced at trial, independent of Oliver's statement, overwhelmingly supported Moore's conviction. Thus, the admission of Oliver's statements did not deny him a fair trial. Furthermore, although there is some doubt whether a separate analysis under Illinois constitutional and evidentiary law is even necessary (see *People v. Duncan* (1988), 124 Ill. 2d 400, 530 N.E.2d 423), we find no prejudicial error under State law.

Trial testimony established that the victim, William Kelly, was shot in his own home in the early morning hours of February 20, 1978. On the day in question, Kelly was 61 years old and he lived in the first-floor apartment at 1506 North Hudson in Chicago. Kelly's daughter, Oralee White, and his granddaughter, Rhonda White, were staying with Kelly in the apartment. Another daughter, Elizabeth Boone, and her boyfriend, Milton Davis, lived in the apartment above Kelly's.

Kelly was well known in the area as "Poppa Kelly" or "the candyman" because he sold candy and soft drinks out of his kitchen to the neighborhood children. Because Kelly had a pacemaker and didn't sleep well lying down, he often slept sitting in a chair in the dining room, just off the kitchen. Consequently, he was known to answer his back door almost anytime of the day or night to sell potato chips, candy, soft drinks or other similar refreshments.

At about 3 a.m. on February 20, 1978, the four defendants knocked at Kelly's back door and, under the guise of wanting to buy some candy and refreshments, entered the apartment. Shortly thereafter Rhonda White, who was sleeping on a couch in the living room, was awakened by the sound of gunshots. Rhonda testified that after the gunshots she heard the back door slam and then heard the sound of people running down the alleyway along the side of the house. Immediately thereafter her grandfather walked into the living room. She could see that he was bleeding, and he told her that he had been shot. Mr. Kelly, who was also carrying a gun, indicated to Rhonda that he believed that "he got [shot] one of them." Rhonda awakened her mother, Oralee, who had also been sleeping on a couch in the living room. Rhonda then knocked at the door of the upstairs apartment and summoned help.

Milton Davis, who lived upstairs with Kelly's daughter, Elizabeth Boone, also testified. He, too, was awakened by the sound of gunshots in the early morning hours of February 20, 1978. After the gunshots he heard someone ring his doorbell. When he answered the door he saw Rhonda, who told him that Kelly had been shot. Elizabeth Boone called the police while Milton Davis went downstairs.

When Davis arrived downstairs he found Kelly lying on the floor of the hallway. He helped Kelly to sit up and at this time Kelly told him that three or four black men had attempted to rob him and that he (Kelly) had been able to shoot one or two of them while resisting their efforts.

The police arrived within a few minutes and found Kelly still alive and conscious but unable to speak. An ambulance was called and Kelly was taken to Henrotin Hospital. He died shortly thereafter.

Dr. Malak, assistant chief medical examiner for Cook County, testified at trial that the autopsy he performed on Kelly revealed that Kelly suffered three gunshot wounds. Kelly died as a result of two of them, one to his chest and the other to his arm. A bullet and a bullet fragment were recovered from Kelly's body. The bullet was .38 caliber and the bullet fragment, although too mutilated to identify precisely, was consistent with a .38-caliber bullet. Based upon the caliber of the bullet and Moore's statements, it was shown that the bullet that entered Kelly's chest came from the gun that Moore had carried.

Chicago police investigator Lawrence Flood testified that on the morning of February 22, 1978, he spoke with a person by the name of Raymond Hampton. As a result of this conversation he and his partner, Investigator Schuler, left Area 6 station and attempted to locate

four persons, Edwards, Oliver, Moore and Wiley, in conjunction with the Kelly murder.

At about 4 p.m. they found Moore at 1410 N. Cleveland and he accompanied them to Area 6. Investigator Flood also testified that he took into possession a blue coat which he found hanging on the back of Moore's bedroom door. The coat had dark spots on it, which later testimony proved to be blood. Testing conducted on these blood spots revealed that the blood did not match Moore's blood type or the blood type of any of the three codefendants. The blood did, however, match Kelly's blood type and subtype.

Oliver was taken into custody soon after Moore, and they were both transported to the station together. Upon their arrival at Area 6 station, the police first interviewed Oliver. Within a short period of time Oliver gave an oral statement to the police in the presence of Assistant State's Attorney Hyman, admitting involvement in the Kelly murder. He then repeated his statement for a court reporter and signed the transcribed statement.

At about 10:30 p.m. on February 22, 1978, after Oliver's statement was transcribed, Oliver's statement was taken into the interview room where Moore was being held. After being advised of his rights, Moore was shown Oliver's statement. Moore then gave his own statement to police, in the presence of Assistant State's Attorney Hyman.

According to Moore's statement, on the evening of February 19, 1978, Moore, Curtis Royal and the three codefendants (Edwards, Oliver and Wiley) decided to rob Kelly. Carrying two guns, they proceeded to Kelly's home. At Kelly's, Wiley and Oliver knocked at the back door and told Kelly that they wanted to purchase something. Once Wiley and Oliver were admitted into the home, Edwards entered the home carrying one of the guns and announced a stick-up. Kelly produced his own gun and began firing at them. Edwards struggled with Kelly and fired his revolver at Kelly two or three times. Moore, who was in possession of the other gun, a .32-caliber revolver, then entered the apartment. He pushed Oliver out of the way and, he claimed, fired his gun into the air. After the incident the four men ran out of Kelly's apartment and back to the apartment Moore shared with his sister, Zenita Underwood.

Moore, with the assistance of Oliver, provided police with a hand-drawn diagram depicting Kelly's kitchen, showing each defendant's position during the incident. Both Moore and Oliver signed the diagram and the paper was then time-stamped at about 1 a.m. on February 23, 1978. Immediately thereafter, at about 1:30 a.m. on February

23, 1978, Moore repeated his statement before a court reporter. During this statement he referred to the diagram that he had drawn.

In addition, Moore gave the police a note for his sister, Zenita Underwood, instructing her to turn over the guns to the police. Investigators Flood and Epplan took the note to Zenita Underwood. At Underwood's request they transported her to the station, where she spoke to Moore. After her conversation with Moore, Underwood accompanied the police officers to a residence at 5739 Iowa. She entered the building alone and returned to the police car with two weapons, which she turned over to the police. The weapons were identified as a .38-caliber Smith and Wesson revolver and a .38 special Smith and Wesson revolver.

Edwards, having learned that the police were looking for him, came to Area 6 station with his mother in the early morning hours of February 23, 1978. At about 2 a.m. Carlos Moore was brought into the interview room where he was being held. Moore told Edwards what he had told the police and then was removed from the room. Edwards, after being advised of his rights, agreed to speak with the police. Edwards admitted that he and the other defendants went to Kelly's home to rob him. He further indicated that, after Wiley and Oliver gained entry into the Kelly home, he entered and announced a stick-up. Kelly pulled a gun, a struggle ensued and shots were exchanged. Moore then entered the room and fired a shot. After the incident they all ran back to Moore's apartment.

At about 2:50 a.m. Edwards repeated his statement before a court reporter. In this statement Edwards identified the guns that had now been recovered through Zenita Underwood as the guns that were used in the incident.

At about 3:10 a.m. on February 23, 1978, Investigators Flood and Epplan brought Wiley into Area 6. Moore was allowed to speak with Wiley briefly and then Wiley was advised of his rights. Thereafter Wiley gave an oral statement to the police which was later repeated before a court reporter. Wiley's statements were substantially identical to the others, except that in his court-reported statement Wiley indicated that he ran out of Kelly's apartment after Kelly pulled a gun and fired a shot. Consequently, Wiley stated that he did not know what happened after that.

Finally, at about 4:15 a.m. on February 23, 1978, Moore gave another court-reported statement. In this statement Moore identified the guns recovered by Zenita Underwood as the guns used during the attempted robbery at Kelly's apartment. Moore also stated that he had instructed Zenita to turn the guns over to police.

Although there were enough statements in this case for an entry in the Guinness Book of Records, it is clear from the evidence, as set forth above, that there was more than sufficient evidence to prove Moore's guilt, even without considering any of the codefendants' statements. Moore alone generated an oral statement, two statements transcribed by a court reporter, a hand-written note to his sister and a hand-drawn diagram of Kelly's kitchen. In addition, Moore's coat was spotted with blood that matched Kelly's type and subtype and the guns, which Moore caused to be recovered, were consistent with the bullets found in Kelly's body.

Edwards and Wiley each made two statements, the admission of which did not, as noted above, violate Moore's sixth amendment right of confrontation. Additionally, it is significant to note that their statements, as well as Oliver's statement, meshed with Moore's confession in every material detail. This was not a situation where the codefendants attempted to shift blame, exculpate themselves or inculpate Moore to any greater extent than he did by his own confession. In fact, in most instances the other defendants' statements inculpated Moore far less than his own statements did. Furthermore, the statements conformed with and corroborated the physical evidence.

It is also significant that the circumstances under which these statements were made do not indicate any heavy-handedness on the part of the police. The confessions were the result of questioning which occurred shortly after each defendant's arrest. Defendants were not held for lengthy periods of time while the police attempted to gather evidence against them. For all these reasons, Oliver's statements may be considered highly reliable.

However, even if we did not find Oliver's statements admissible under the *Lee* standard, we would find that Oliver's statements were a mere redundancy of the abundant evidence properly presented at trial. Consequently, there is no question in this court's mind that the admission of Oliver's statements did not prevent Moore from obtaining a fair trial.

The next question presented for this court's consideration is whether the State failed to prove that Moore's statements were voluntary. The record shows that prior to trial Moore filed a motion to suppress his admissions and a hearing was held on the motion. After considering the evidence presented at the hearing, the trial court concluded that Moore's statements were voluntary.

A trial court's determination that a defendant's statement was given voluntarily may not be reversed unless, based upon the totality of the circumstances, we can say that the trial court's ruling was

against the manifest weight of the evidence. (*People v. Terrell* (1989), 132 Ill. 2d 178, 198, 547 N.E.2d 145.) After reviewing the evidence, we find no basis for reversing the trial court's conclusion.

The standard by which a reviewing court must measure any claim of involuntariness does not depend on any singular factor, but upon the totality of circumstances. (*People v. Ramey* (1992), 152 Ill. 2d 41, 57-58, 604 N.E.2d 275; *People v. Redd* (1990), 135 Ill. 2d 252, 292, 553 N.E.2d 316.) Ultimately, the test is whether the conditions under which the statements were made indicate that defendant's will was overcome. (*People v. Ramey*, 152 Ill. 2d at 57; *People v. Terrell*, 132 Ill. 2d at 198.) After the State presents a *prima facie* case that the confession was voluntary, the burden shifts to the defendant to show that the waiver of his rights and his decision to confess were not knowing, intelligent and voluntary acts. *People v. Smith* (1990), 199 Ill. App. 3d 839, 557 N.E.2d 596.

Moore's claim on appeal is that his confessions were not voluntary due to an incapacity stemming from epilepsy. That Moore was afflicted with epilepsy seems uncontradicted. But there is nothing in the record to suggest that his condition affected the voluntariness of his statements. Nor does Moore even attempt to enlighten this court on the manner in which his epilepsy might have disabled him.

At the hearing on Moore's motion to suppress his statements, Moore and his father both testified that Moore had suffered from epilepsy for some years. However, it was never contended in either the written motion or the oral clarification of the motion that Moore's counsel provided to the court that Moore's epilepsy incapacitated him to the extent that his admissions were involuntary. Nor was this argued during the motion or at trial. The main thrust of Moore's argument at the suppression hearing was that he was beaten by the police, deprived of basic amenities and refused access to his attorney. These were the primary bases upon which Moore relied to support his allegation of physical and mental coercion.

At trial Moore again indicated that he was physically and mentally coerced by the police, claiming that he was beaten and deprived of food and medication. However, he never stated or even implied that the lack of medication rendered him incapable of understanding the implications of the statements he was making.

Now on appeal Moore abandons all the other previously alleged bases for finding his statements involuntary and relies solely upon his epileptic condition. Without reference to supporting case law, Moore contends that because he was an epileptic and did not receive medica-

tion for this condition during the time that he was in police custody, we must find that his statements were involuntary. We disagree.

██ In this case the State made a strong showing, supported by the testimony of three police officers, a court reporter and an assistant State's Attorney, that Moore knowingly waived his rights after being properly admonished. The testimony that the State presented indicated that Moore was conscious, coherent and fully cognizant of his own actions. Even defendant's own testimony supports this finding. Relevant to his epilepsy, defendant merely stated that without his medication he felt that he might have a seizure and felt "nervous" and shaky. He never indicated that he couldn't understand the meaning of his actions. Consequently, we find that the mere fact that Moore suffered from epilepsy, without more, does nothing to overcome the State's *prima facie* showing that Moore voluntarily confessed to his participation in Kelly's murder. Considering the standard of review and the evidence, we must find that Moore's confessions were voluntarily made.

This court's own research revealed an extremely limited number of cases involving epilepsy. In *People v. Romaine* (1979), 79 Ill. App. 3d 1089, 399 N.E.2d 319, the defendant's affirmative defense to charges of armed robbery and armed violence was that he was insane due to the fact that he suffered from limbic epilepsy. A psychiatrist testified that limbic epilepsy, also known as episodic discontrol syndrome, differed from the more common convulsive types of epilepsy (*i.e.*, the chronic disease which manifests itself through seizures which cause unconsciousness, shaking and falling down). The psychiatrist testified that a person suffering from limbic epilepsy could manifest a state of extreme rage. Such a person might be physically abusive and, though he could understand what was happening, would not have control over his behavior. Despite this testimony, the jury rejected the defense and the reviewing court affirmed, finding that the evidence did not necessarily require a finding that defendant did not have the capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law.

Ironically, in *United States v. Rose* (W.D. Ky. 1981), 657 F.2d 270, defendant claimed that an admission he made was not voluntary because, among other reasons, it was taken while he was under the influence of the medication he took for his epilepsy. The reviewing court summarily rejected the claim.

These cases lend support for this court's finding that the voluntariness of defendant's admissions was unaffected by the fact that he was an epileptic. Moore presented no evidence to show the severity of

his condition or the effect that a deprivation of medication might have on his behavior.

The next issue is whether Moore was denied a fair trial due to his trial counsel's conflict of interest stemming from the joint representation of Moore and codefendant Wiley. The State argues that this issue is waived because Moore failed to object at trial to his privately retained counsel's joint representation of him and Wiley and because trial counsel did not indicate in the post-trial motion that his ability to represent Moore was impaired by the joint representation of Wiley.

Our supreme court has repeatedly held that, absent plain error, waiver will apply and appellate review will be denied where the alleged errors were neither objected to at trial nor raised in a post-trial motion. (*People v. Pasch* (1992), 152 Ill. 2d 133, 604 N.E.2d 294.) Furthermore, courts have held that unless the potential for a conflict of interest based upon multiple representation is brought to the attention of the trial court, the trial court may assume that the multiple representation of defendants entails no conflict and that defendants have knowingly waived any risk of conflict. (*Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708.) Absent an objection to the joint representation, defendant must demonstrate an actual conflict which adversely affected his counsel's performance. *Cuyler v. Sullivan*, 446 U.S. at 348, 64 L. Ed. 2d at 346-47, 100 S. Ct. at 1718.

■ Moore apparently concedes that no objection was made at trial since he claims on appeal that the matter is reviewable because the record evidences an actual conflict of interest. However, Moore does not demonstrate an actual conflict of interest. Moore merely contends that trial counsel was hindered from "effectively utilizing" a minor discrepancy in Wiley's oral statement to Moore's advantage. However, trial counsel did bring the discrepancy in the statements to the attention of the jury and, furthermore, as stated earlier, Wiley testified at trial and denied making the statements altogether. Wiley's and Moore's defenses were not conflicting. Rather, Wiley's testimony was consistent with Moore's defense that their statements were the fabrication of the police. In addition, Moore presents no plausible alternative defense strategy that might have been employed by separate counsel. Thus, we conclude that any conflict of interest is, at best, hypothetical and speculative and reversal of Moore's conviction is not required. See *People v. Jones* (1988), 121 Ill. 2d 21, 520 N.E.2d 325; *People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671.

■ The fourth issue is whether Moore was denied due process because the trial court refused to allow two proffered defense witnesses (the Hamptons) to testify concerning the alleged abusive treatment

they received at the hands of unidentified police officers while they were held in custody and interrogated in conjunction with the Kelly investigation. In an offer of proof, defendants informed the court that the Hamptons were prepared to testify that they were beaten and coerced into making statements by the police. As Moore acknowledges, this issue was raised by Edwards, Wiley and Oliver in their consolidated appeals and this court rejected the assertion of error in a Rule 23 order, finding that the proffered testimony of these witnesses was immaterial and irrelevant. We stand by our earlier ruling as set forth in that Rule 23 order.

A trial court may exclude evidence it finds to be immaterial and irrelevant. Absent a clear showing of an abuse of discretion, the trial court's ruling on the admission of testimony will not be overturned. (*People v. Williams* (1990), 196 Ill. App. 3d 851, 554 N.E.2d 1040.) We find no direct correlation between the coercive tactics allegedly experienced by the Hamptons and Moore's case. Therefore, we find no abuse of discretion in the exclusion of these witnesses. As an aside we note that despite the Hamptons' alleged beatings and coercion, the Hamptons did not confess to the crime. Therefore, Moore's contention that the Hamptons' testimony of coercion would tend to show that he was beaten and coerced into confessing is inherently faulty.

Finally, Moore contends that the extended-term sentence he received was improper and excessive. Initially, we note that defendant was found to be eligible for the death penalty, but that the court found sufficient mitigating factors to preclude its imposition. Defendant was then sentenced to the maximum extended term of 80 years' imprisonment, based upon the trial court's finding that the murder had been accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty and that defendant must be kept from society for its protection.

Although this court agrees that we live in an era of increased crime rates and correspondingly increased sentences, we have found that the increased sentences do nothing to deter crime or make a better society. Nor do they alleviate the serious problem of overcrowding in our jails. The only thing that a lengthy jail sentence accomplishes is a false sense of security for the rich and feeling of despair and insecurity for the poor.

Nevertheless, it is not this court's function to impose its own sense of crime and punishment. Rather, the imposition of a sentence is a decision peculiarly within the province of the trial judge, who had the opportunity to hear the evidence as well as the factors in mitigation and aggravation. (*People v. Barfield* (1989), 187 Ill. App. 3d 190,

543 N.E.2d 812.) We find no abuse of the broad discretion given to trial courts when imposing sentences.

■■ In this case four young men planned to rob an elderly man with a pacemaker who was known to run a concession business out of his home for the convenience of the neighborhood children. The four young men went to the man's house, induced him to open his door under the guise of wanting to purchase a snack and repaid his kindness by aiming guns at him and announcing a holdup. When the elderly man attempted to defend himself the four young men did not run away. Instead, one of them wrestled with the man to get his gun away from him and, while the man was so engaged, Moore entered the home and fired shots at the man. Under these circumstances, the trial court acted within its power when it imposed an extended-term sentence on Moore based upon the cold and brutal disregard Moore exhibited for Kelly's life.

For all the reasons stated above, we affirm Moore's convictions and sentence.

Affirmed.

GORDON, P.J., and McNULTY, J., concur.